# Illinois Official Reports

## Appellate Court

---

**_Mickens v. CPS Chicago Parking, LLC_, 2019 IL App (1st) 180156**

---

| | |
|---|---|
| Appellate Court Caption | JAUKITA MICKENS, Plaintiff-Appellant, v. CPS CHICAGO PARKING, LLC, an Illinois Limited Liability Company, FOUR SEASONS SERVICES, INC., an Illinois Corporation, and NORTHEAST ILLINOIS REGIONAL COMMUTER RAILROAD CORPORATION, d/b/a Metra, an Illinois Not-for-Profit Corporation, Defendants-Appellees. |
| District & No. | First District, Third Division<br>Docket No. 1-18-0156 |
| Filed | June 26, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-L-9864; the Hon. John P. Callahan Jr., Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Neal S. Gainsberg and Nicholas Kreitman, of Gainsberg Law, P.C., of Chicago, for appellant.<br><br>Justin J. Power, of Hilbert & Power, Ltd., of Chicago, for appellees. |
| Panel | JUSTICE ELLIS delivered the judgment of the court, with opinion.<br>Justices Howse and Cobbs concurred in the judgment and opinion. |

## OPINION

¶ 1    Plaintiff, Jaukita Mickens, was seriously injured when she slipped and fell on ice at a Metra train station. She alleged that defendants (Metra, the property manager, and a snow-removal contractor) negligently failed to clear the pedestrian ramp where she fell. Defendants moved for summary judgment, claiming plaintiff failed to show an unnatural accumulation of ice that would render them liable. The circuit court granted summary judgment to all defendants.

¶ 2    We reverse and remand. We find a question of fact as to whether the ice formed naturally or unnaturally. And we hold that the property manager and snow-removal contractor could be held liable for even natural accumulations of snow or ice.

### BACKGROUND

¶ 4    In the early morning of Monday, February 9, 2015, Mickens was walking down a pedestrian ramp at a Metra station in Harvey (Metra Station) when she slipped on a sheet of ice that she estimated as an inch thick. The slip and fall caused a severe ankle injury that required next-day emergency surgery. She missed about three months of work.

¶ 5    Mickens is a medical assistant who works at one of Northwestern Hospital's outpatient locations in Chicago. On the morning of her fall, Mickens and her daughter were at the Metra Station for a 6:59 a.m. train into Chicago. As usual, Mickens drove to the Metra Station and parked in the paid parking lot. To pay for parking, customers use stand-alone pay boxes. Mickens and her daughter walked toward the train platform together, but because Mickens was paying, she stopped at a pay box while her daughter continued toward a nearby concrete ramp down to the platform. After paying, Mickens walked down the ramp behind her daughter.

¶ 6    While walking down the ramp, she described noticing "slush" on the ground. To her, "it looked like it could have snowed like maybe the weekend and it was starting to melt." As she was walking, she fell and seriously injured her ankle. According to her, the ground "didn't feel slippery. It felt like a lump. Like my foot hit something, which I'm assuming it probably was the ice I thought that was slush, so it probably hit the ice." She said "it appeared to be just wet, like a wet slush. It didn't appear to be slippery at all." She tried to get up but could not. While on the ground, she "felt ice. It felt, hard ice. Not the slush that I thought was there. It was like, hard ice." Mickens was unable to get up and was taken to the hospital by ambulance.

¶ 7    Mickens stated that she never saw a lump her foot hit. To her, the ground just looked like "slush." It was not until after she had fallen that she realized the "slush" was actually a solid sheet of ice "maybe one inch or so" thick. She said "it looked like it had snowed and the ice—the snow had hardened and it hadn't been shoveled. Like, it looked untreated." She estimated the sheet of ice covered the entire width of the ramp, though she could not be certain.

¶ 8    Mickens sued Northeastern Illinois Regional Commuter Railroad Corporation, d/b/a Metra (Metra), CPS Chicago Parking, LLC (CPS), and Four Seasons Services, Inc. (Four Seasons). Metra owned and operated the Metra Station where Mickens was injured. CPS served as the property manager per its contract with Metra. CPS, in turn, contracted with Four Seasons to perform snow and ice removal at the Metra Station.

¶ 9    At the time of Mickens's fall, David Hayes was the fleet supervisor at Four Seasons. In addition to his supervisory duties, he also performed plowing services and personally performed all plowing and salting operations at the Metra Station. At his deposition, Hayes

testified that there is no regular schedule for inspecting the Metra Station or providing services; instead, services are provided depending on the weather. To determine when plowing and salting is required, he constantly monitors various weather reports and discusses the course of action with CPS employee Eric Bowman.

¶ 10 Hayes acknowledged that Mickens slipped at a location where he was required to provide snow and ice removal services. He testified that the last time he plowed and salted the Metra Station was the night of Wednesday, February 4—several days before the accident on the morning of Monday, February 9. The work took about four hours; he finished sometime in the early morning of February 5. Hayes stated that he would have spent about five minutes shoveling and salting the area where Mickens fell.

¶ 11 In the afternoon of February 5, Hayes returned to the Metra Station. He listed two reasons for doing so. One was to ensure that the premises still "look[ed] good." That is something he typically does after a plowing job, he said: "I check stations to make sure that the ice melted and everything else looks good, snow doesn't need to be ever removed to provide more room for another snowfall coming." A second reason, related to the first one, was to determine whether any "loader" work was necessary, meaning if it was necessary to transport the plowed snow from the platforms and pay stations to the rear of the station, in case another snowfall were to soon occur.

¶ 12 Hayes testified that during this February 5 inspection of the Metra Station, "there was no snow on the sidewalks, in the parking lot left from the prior storm." At another point, he testified (albeit more generally, not specific to this February 5 plowing) that when he shovels a walkway, he shovels the snow "[a]way from the walk areas, the common area."

¶ 13 After doing his look-over on February 5, Hayes did not return to the Metra Station until February 26, when he was required to plow and salt it again.

¶ 14 The defendants moved for summary judgment, claiming that they owed no duty to remove natural accumulations of snow and ice, and there was no evidence in the record that the ice on which Mickens fell was anything but a natural accumulation. In response, Mickens argued that due to the Metra, CPS, and Four Seasons contracts, the defendants had undertaken the duty to remove even natural accumulations of snow and ice. Alternatively, she argued that a question of fact existed as to whether her fall was caused by an unnatural accumulation of snow and ice. As part of her response, Mickens referenced a complaint made to Metra by another person, Fiesha Burge, about the icy conditions of the station on February 5—after Hayes would have performed snow and ice removal services. The defendants replied that this mention of Burge's complaint was inadmissible.

¶ 15 Shortly after defendants' reply, Mickens filed an emergency motion to file a verified statement of Burge. Her motion sought leave to file the affidavit of Burge and to supplement her response with the affidavit. The court granted Mickens leave to file the affidavit but gave defendants leave to file a motion to strike the same affidavit, which they did.

¶ 16 In her affidavit, Burge swore that she slipped "on ice that had not been salted in the parking lot" at the Metra Station at about 7:45 a.m. on February 5. She believed that "no area of the station had been salted." She "saw that there was snow piled around the parking lot pay box, the ramp near the pay box, and elsewhere at the [Metra Station]." She "saw that sheets of ice had formed on the ground at the [Metra Station], especially around the pay box and ramp near it." She went on to state that she believed this ice was caused by snow that had melted and refrozen. That same day, Burge called Metra to complain about the ice and her fall.

¶ 17 The court entered summary judgment for all defendants in an order that does not explain its reasoning other than to reference the reasons given in open court. We have no transcript of that hearing, however. Nor does the record contain any indication of a ruling on the motion to strike Burge's affidavit.

¶ 18 Mickens moved for reconsideration. In this motion, in addition to her natural-accumulation argument, she asked the court to "revisit its initial decision regarding unnatural accumulation." Her brief on appeal states that the court made a finding "that Plaintiff fell on a natural accumulation of snow and ice and granted summary judgment as to all Defendants."

¶ 19 The court denied Mickens's motion to reconsider. This appeal followed.

¶ 20                                                     ANALYSIS

¶ 21 Summary judgment is appropriate if "there is no genuine issue as to any material fact and *** the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2016). It is a drastic measure and should only be granted where the movant's right to judgment is free and clear from doubt. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). We construe the record strictly against the movant and in favor of the nonmoving party. *Allen v. Cam Girls, LLC*, 2017 IL App (1st) 163340, ¶ 28. To defeat summary judgment, the nonmoving party must present some evidence that arguably entitles it to judgment. *Id.* We review a grant of summary judgment *de novo*, meaning we perform the same analysis as the trial court. *A.M. Realty Western L.L.C. v. MSMC Realty, L.L.C.*, 2016 IL App (1st) 151087, ¶ 87.

¶ 22 One of the defendants here, Metra, is the owner of the Metra Station. CPS was the property manager that, as we will see, had a duty to remove ice and snow in its contract with Metra. Four Seasons was the subcontractor whose sole function was snow and ice removal. The law distinguishes between landowners and those who contract with the landowner to remove snow and ice. So we must consider the liability of Metra separately and apart from that of the other defendants.

¶ 23                                                          I

¶ 24 We begin with the liability of Metra for the ice that formed on the ramp, ice on which Mickens testified that she slipped and injured herself.

¶ 25                                                          A

¶ 26 Generally, landowners and occupiers have no common-law duty to remove natural accumulations of snow and ice from their property. *Murphy-Hylton v. Lieberman Management Services, Inc.*, 2016 IL 120394, ¶ 19; *Krywin v. Chicago Transit Authority*, 238 Ill. 2d 215, 232 (2010) (applying natural-accumulation rule to property of common carriers). A "natural accumulation" is just what it suggests—an accumulation of snow or ice caused by the mere falling and settling of snow or precipitation.

¶ 27 Illinois has this "natural-accumulation" rule, relieving landowners of the duty to remove naturally fallen snow or naturally formed ice, because "to hold otherwise would create an unreasonable burden of vigilance" on a landowner given " ' "the climactic vagaries" ' " of Illinois, " ' "with its unpredictable snowfalls and frequent temperature changes." ' " *Murphy-Hylton*, 2016 IL 120394, ¶ 19 (quoting *Tzakis v. Dominick's Finer Foods, Inc.*, 356 Ill. App.

3d 740, 748 (2005), quoting *Lapidus v. Hahn*, 115 Ill. App. 3d 795, 801 (1983)); see also *Hussey v. Chase Manor Condominium Ass'n*, 2018 IL App (1st) 170437, ¶ 18 (natural-accumulation rule based on "harsh, unpredictable, and rapidly changing winter weather" in Illinois, for which it would be "unreasonable to hold landowners to a duty of immediate and effective removal of snow and ice").

¶ 28    So if a landowner fails to remove snow or ice that naturally accumulated—either because it made *no* attempt at removal, or because it made *some* attempt but did not remove all the snow or ice—that landowner is not liable for injuries caused by those natural accumulations, no matter how dangerous they may be. *Murphy-Hylton*, 2016 IL 120394, ¶ 19; *Graf v. St. Luke's Evangelical Lutheran Church*, 253 Ill. App. 3d 588, 591-92 (1993) ("The mere removal of snow leaving a natural ice formation underneath does not constitute negligence."); *Eichler v. Plitt Theatres, Inc.*, 167 Ill. App. 3d 685, 692 (1988) (same); *Timmons v. Turski*, 103 Ill. App. 3d 36, 38 (1981) (same); *McCann v. Bethesda Hospital*, 80 Ill. App. 3d 544, 549 (1979) (same).

¶ 29    But the law treats *unnatural* accumulations of snow or ice differently. The law imposes on landowners "a duty of reasonable care to prevent unnatural accumulations of ice and snow on their premises where they have actual or constructive knowledge of the dangerous condition." *Murphy-Hylton*, 2016 IL 120394, ¶ 20. An accumulation of snow or ice is "unnatural" if it "accumulated by artificial causes or in an unnatural way or by a defendant's own use of the area concerned and creation of the condition." (Internal quotation marks omitted.) *Id.*

¶ 30    For example, a mound or pile of snow created by snow-removal efforts has long been considered an unnatural accumulation, as the pile was created not by naturally falling snow but by shoveling or plowing. See, *e.g.*, *Ziencina v. County of Cook*, 188 Ill. 2d 1, 13 (1999); *Russell v. Village of Lake Villa*, 335 Ill. App. 3d 990, 994 (2002); *Sims v. Block*, 94 Ill. App. 2d 215, 223 (1968). Likewise, if that mound of snow melts, leading to water runoff that refreezes into a sheet of ice, we have consistently found that sheet of ice to be an unnatural condition. See, *e.g.*, *Russell*, 335 Ill. App. 3d at 995; *Hussey*, 2018 IL App (1st) 170437, ¶ 21; *Fitzsimons v. National Tea Co.*, 29 Ill. App. 2d 306, 314 (1961); see *Murphy-Hylton*, 2016 IL 120394, ¶ 22.

¶ 31    Here, Mickens testified in her deposition to slipping on ice on the Metra ramp. So the question is how that ice got there. Did it naturally form, meaning Four Seasons failed to remove it when it plowed the Metra Station on February 4 and 5? Or, as Mickens claims, was it an unnatural result of Four Seasons negligently plowing the ramp and surrounding area? More pointedly for our purposes, of course, the question is whether there is a disputed issue of fact on this question, precluding summary judgment.

¶ 32                                            B

¶ 33    Mickens says that this case presents a classic example of an unnatural condition. Her theory is that the sheet of ice formed when Four Seasons piled snow into mounds on and around the Metra ramp, after which the temperatures warmed and the snow melted, followed by a drop in the temperatures that led the water runoff to refreeze, creating dangerous ice on the ramp. At a minimum, she argues, there is sufficient evidence of this scenario to create a question of fact, precluding summary judgment.

¶ 34    Metra, on the other hand, claims that there is no evidence of an unnatural condition here. The only other possibility, then, is that the ice was the product of natural accumulation, and Metra owed no duty to remove it or otherwise protect Mickens from it.

¶ 35    The trial court did not specify its basis for summary judgment in its written order, and there is no transcript of that hearing from which that order was produced. That does not preclude our review, as we consider the question *de novo*, so the trial court's reasoning is immaterial. *Fields v. Schaumburg Firefighters' Pension Board*, 383 Ill. App. 3d 209, 223 (2008). In any event, from the parties' briefing below and before this court, it certainly appears that the trial court ruled that there was no evidence of an unnatural accumulation.

¶ 36    As noted, we draw all reasonable inferences at this stage in favor of the nonmovant, Mickens, and we determine not whether Mickens is entitled to judgment but whether she arguably could win, based on the evidence at hand. *Allen*, 2017 IL App (1st) 163340, ¶ 28. We remain mindful as well that it is Mickens's burden to demonstrate an identifiable link between the snow pile and the ice on which she slipped. See *Hornacek v. 5th Avenue Property Management*, 2011 IL App (1st) 103502, ¶ 32; *Russell*, 335 Ill. App. 3d at 996.

¶ 37    Taking the evidence in the light most favorable to Mickens, the record shows that it snowed on Wednesday, February 4, and Four Seasons plowed the snow later that night and into the early hours of February 5. Later that morning, February 5, the eyewitness Fiesha Burge (testifying via affidavit), besides slipping on ice herself in the Metra Station parking lot, noted "snow piled around the parking lot pay box, the ramp near the pay box, and elsewhere" at the Metra Station. She also "saw that sheets of ice had formed on the ground at the [Metra Station], especially around the pay box and ramp near it." It is undisputed that the pay box was near the top of the ramp and that the ramp sloped downhill.

¶ 38    Then there is the testimony of David Hayes, the Four Seasons supervisor who personally plowed the snow at the Metra Station on late February 4 into early February 5. His testimony, to some extent, contradicts that of Burge and, to some extent, supports it. He claimed that he typically inspects his snowplowing work the day after to make sure that any ice has melted and that snow does not need to be removed to provide more room for another snowfall. And when he returned to review the Metra Station in the late afternoon of February 5—which would have been anywhere from approximately 12 to 15 hours after he plowed the station—"there was no snow on the sidewalks, in the parking lot left from the prior storm."

¶ 39    Two points about Hayes's testimony. First, we might be able to glean from his testimony that, when he shoveled the Metra Station on February 4-5, he removed all the snow off the ramp (where Mickens fell) and by the pay station immediately above the ramp. His reference to "no snow on the sidewalks" was vague. Elsewhere in his deposition, he testified more generally that he would shovel that ramp down to the surface, and that he would move the snow "[a]way from the walk areas, the common areas." He did not quite say that is what he did on February 4 and 5. But even if we took his testimony as such, that testimony is obviously inconsistent with the testimony of Burge, who saw snow piles by the pay station right by the ramp, as well as on the ramp itself, on the morning of February 5. We would resolve any contradictions in the testimony, at this stage, in favor of the nonmovant, Mickens, meaning we must assume that the snow was not removed completely but, rather, was piled along the side of the ramp and by the pay station immediately above the ramp as of February 5.

¶ 40    The second thing of note is Hayes's testimony that, when he returns to a site the day after plowing, he confirms that no ice is remaining—that it was removed or that it has melted if not removed. So when he returned to the Metra Station on the afternoon of February 5 and determined that "everything look[ed] good," presumably that means he was satisfied that a sheet of ice was *not* covering the ramp at that time. (We say "presumably," because Hayes was

never asked that pointed question.) It is certainly a fair inference that, had Hayes observed an inch-thick sheet of ice on the ramp or even parts of that ramp during his post-plowing inspection, he would not have ignored it and deemed the state of affairs satisfactory.

¶ 41    As for the weather: First, it is undisputed that no additional precipitation—no new naturally accumulating snow or ice—fell between the date that Four Seasons plowed the Metra Station (February 4-5) and when Mickens fell (February 9). The temperatures for the days before and including her fall are also undisputed: On February 7, the high was 44 degrees and the low was 25 degrees. On February 8, the high was 42 degrees and the low 31 degrees. On February 9, the day Mickens fell, the temperature did not rise above freezing: the high was 31 degrees.

¶ 42    Viewed in the light most favorable to Mickens, the record shows that Four Seasons plowed the snow into piles on the ramp where Mickens fell and at the top of the ramp at the pay box; in the days preceding her fall, the temperatures fluctuated between below-freezing and above-freezing temperatures; on the day of her accident, the temperatures never rose above freezing. That sequence of events could easily translate to the very scenario Mickens posits—that snow piles melted, causing water runoff that refroze on the ramp. And of course, if Hayes was satisfied that a sheet of ice was *not* present on the ramp when he reinspected the property on the afternoon of February 5, and if a sheet of ice *was* present on the ramp on February 9 when Mickens fell, with no intervening precipitation in the interim, one might wonder how *else* the ice could have formed *but* unnaturally. See, *e.g.*, *Ordman v. Dacon Management Corp.*, 261 Ill. App. 3d 275, 282-83 (1994) (lack of additional precipitation between time of defendant's shoveling of snow and plaintiff's slip on ice was evidence of unnatural formation of ice).

¶ 43    We cannot say one way or the other conclusively, and we do not purport to do so. We are not making a finding that the ice formed unnaturally; it remains possible that it formed naturally. The facts have not been fully fleshed out. But fleshed out enough, at least, to easily create a question of fact as to whether the ice was formed naturally or unnaturally.

¶ 44    It is common knowledge, after all, that snow melts when the temperatures rise above freezing and that water freezes in subfreezing temperatures. *Russell*, 335 Ill. App. 3d at 996 (it is "common knowledge" that "water can melt, freeze, or refreeze depending on the temperature at any given time"); *Johnson v. National Super Markets, Inc.*, 257 Ill. App. 3d 1011, 1016 (1994) ("it is within common knowledge that if the sun shines, snow will melt, and if it is in a large pile, the water from the snow will run down the pile, and if the temperature drops, it will refreeze in the area in which it collected"). It is just as obvious that if a pile of snow at the top of a downhill ramp melts, the water may run down the ramp. *Williams v. Stanley Machining & Tool Corp.*, No. 98 C 0402, 1999 WL 756164, at *3 (N.D. Ill. Sept. 13, 1999) (construing Illinois law and indicating "[i]t is common knowledge that water runoff from melted snow will flow in accordance with the laws of gravity"); *Johnson*, 257 Ill. App. 3d at 1016 ("It is also within common knowledge for a person to know that, if a parking lot slopes toward the entrance of the store and snow melts, the water will run downhill ***.").

¶ 45    Consider, for example, a staircase up to a church, separated down the middle by a handrail, where the landowner removes the snow from one side of the stairs over onto the other side, thus piling all the snow on one side. After ice formed on the "cleared" side of the staircase and the plaintiff slipped on it, we held that a jury could conclude "that the ice on which plaintiff fell was caused by runoff from the snow piled on the other side of the stairs." *Graf*, 253 Ill. App. 3d at 592. As there was sufficient evidence that the ice on the shoveled side was the result of an unnatural accumulation, summary judgment for the landowner was improper. See *id.*

¶ 46    As there is sufficient evidence here of (1) snow mounds piled above and on the pedestrian ramp on February 5, (2) a cycle of thawing and refreezing caused by the rising and falling temperatures in the days that followed, (3) no additional precipitation in the interim, and given (4) the contrast between Hayes presumably seeing no sheets of ice on the ramp on the afternoon of February 5 but Mickens slipping on ice on February 9, Mickens has created a triable issue of fact as to whether the ice formed from unnatural causes.

¶ 47    The cases cited by defendants do not convince us otherwise. In *Crane v. Triangle Plaza, Inc.*, 228 Ill. App. 3d 325, 332 (1992), the plaintiff could not establish a causal link between snow piled on the periphery of the parking lot and a two-by-four-foot patch of ice by the opposite end of the plaintiff's car on which she slipped and fell. But it was undisputed that the parking lot *did not slope*, and thus there was no explanation in the record for how water runoff from melting snow could have travelled sideways the length of a car, from the snow pile to the depression in the lot where the fall occurred. (That was truer still because the lot itself was not a smooth surface but one "comprised of gravel, sand and dirt" and full of depressions. *Id.* at 327.) See *Graf*, 253 Ill. App. 3d at 593 (likewise distinguishing *Crane*).

¶ 48    The evidence in *Crane* further showed that the naturally accumulated snow had not been completely removed post-shoveling—some naturally accumulated snow remained—and additional precipitation had occurred post-shoveling (an inch of rainfall and a dusting of snow), which would obviously be natural accumulations. *Crane*, 228 Ill. App. 3d at 327. There were, in other words, more plausible ways that ice could have formed in the depression containing the ice patch where the plaintiff slipped, compared to the plaintiff's entirely speculative theory.

¶ 49    Maybe water from melted snow can travel sideways, horizontally, over a lumpy surface of gravel, sand, and dirt. But the *Crane* plaintiff offered no expert or factual predicate for that possibility. Here, on the other hand, as noted, we require no expert testimony to know that snow will melt when the temperatures warm and that water will comply with the laws of gravity. The snow piles here were not a car length's away from the ice at the same grade level; the ice was on a downward ramp, and the snow piles were immediately above that ramp and on the ramp itself.

¶ 50    Metra also cites *Zide v. Jewel Tea Co.*, 39 Ill. App. 2d 217, 221 (1963), where the plaintiff slipped in the defendant's parking lot after the defendant had shoveled the surface, leaving behind a thin film of " 'hard packed snow.' " The plaintiff parked her car, got out, and slipped and fell. *Id.* at 220. She claimed that unnatural ice had formed from the melting of snow around the store entrance that had been gathered by the defendant. *Id.* at 224. This court found, however, that there was "no evidence in the record that the application of salt to snow and ice around the store entrance would produce water that would flow or drain to the place where the plaintiff fell," nor was there any evidence "that water drained or would drain from the area around the store entrance to the place where the plaintiff fell." *Id.* at 224-25.

¶ 51    Here, unlike *Zide*, there is a natural and logical connection between the piles of snow on and above the ramp to the ice that formed on the ramp.

¶ 52    Because a question of fact exists as to whether the ice on which Mickens slipped was the product of a natural or unnatural accumulation, summary judgment in favor of Metra was error.

¶ 53                                                                   II

¶ 54          We next consider the liability not of the landowner but of the entities that contractually promised to remove snow from the Metra Station—the property manager, CPS, and its subcontractor, Four Seasons.

¶ 55                                                                   A

¶ 56          In some instances, a contract to provide snow-removal services can itself create a duty in tort to remove snow or ice—a duty that extends to an individual coming onto the property. One example is when the landowner makes a direct promise to an individual to keep the property free of snow or ice accumulation. If that landowner fails to do so, and the individual is injured by the presence of snow or ice, the landowner is liable to the individual even if the snow or ice was the result of a mere natural accumulation. See *Schoondyke v. Heil, Heil, Smart & Golee, Inc.*, 89 Ill. App. 3d 640 (1980); *Tressler v. Winfield Village Cooperative, Inc.*, 134 Ill. App. 3d 578 (1985).

¶ 57          In *Schoondyke*, 89 Ill. App. 3d at 644, the defendants, a condominium association and the developer of the condominiums, entered into a condominium agreement with plaintiff, one of the unit owners, under which the defendants agreed to remove natural accumulations of snow and ice. We recognized that the defendants had no common-law duty to remove that snow or ice but held that the defendants voluntarily assumed a duty of snow removal by contract, rendering summary judgment in favor of the defendants inappropriate. *Id.* at 643-45. In *Tressler*, 134 Ill. App. 3d at 580, we recognized that, while the landlord in that case did not have a common-law duty to remove snow or ice from the premises, it had voluntarily assumed a duty to remove snow and ice in its lease with plaintiff.

¶ 58          These cases simply recognize that a duty that does not arise from the common law can be voluntarily assumed, often called a "voluntary undertaking." See *Frye v. Medicare-Glaser Corp.*, 153 Ill. 2d 26, 32 (1992). The duty of care imposed on a defendant in that instance is limited to the scope of its undertaking. *Id.*; *Pippin v. Chicago Housing Authority*, 78 Ill. 2d 204, 210 (1979). The common law, in other words, has nothing to say about it; the scope of the voluntary undertaking decides the scope of the duty. So if that duty stems from a promise made in a contract, then the duty is limited to the scope of the contractual language. Thus, for example, in *Schoondyke*, 89 Ill. App. 3d at 644, the common-law natural-accumulation rule was irrelevant, because the duty to remove naturally accumulated snow and ice did not stem from the common law but from the voluntary undertaking contained in the contract.

¶ 59          *Schoondyke* and *Tressler* are different from the facts here because the contractual promises in those cases were directly between the defendants and the plaintiffs. Here, CPS's snow-removal duty was in its property management contract with Metra. Likewise, in its subcontract, Four Seasons promised CPS that it would remove snow and ice from the Metra station. Mickens, quite obviously, had no relationship to either contract.

¶ 60          But even contracts between a landowner and a contractor may impose a duty of care on the contractor to third parties. Section 324A of the Restatement (Second) of Torts provides in pertinent part as follows:

                  "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his

failure to exercise reasonable care to protect his undertaking, if \*\*\* (c) the harm is suffered because of reliance of the other or the third person upon the undertaking." Restatement (Second) of Torts § 324A (1965).

¶ 61    Our supreme court has adopted section 324A, including this specific reliance provision in subsection (c). See *Pippin*, 78 Ill. 2d at 210-11 (1979); *Scott & Fetzer Co. v. Montgomery Ward & Co.*, 112 Ill. 2d 378, 390-91 (1986); *Bell v. Hutsell*, 2011 IL 110724, ¶ 12 (recognizing adoption). And we have determined that snow-removal contracts are one type of contract that is recognized, for the purposes of section 324A, as being for the protection of third parties coming onto the landowner's property. See *Allen*, 2017 IL App (1st) 163340, ¶ 30; *Eichler*, 167 Ill. App. 3d at 691-92. Thus, this court has looked to section 324A in determining the liability of a snow-removal contractor to plaintiffs injured when slipping on snow or ice. See *Allen*, 2017 IL App (1st) 163340, ¶ 30; *Eichler*, 167 Ill. App. 3d at 691-92; *Jordan v. The Kroger Co.*, 2018 IL App (1st) 180582, ¶ 30; *McBride v. Taxman Corp.*, 327 Ill. App. 3d 992, 996-97 (2002). As both the Metra-CPS contract and the CPS-Four Seasons subcontract contained a promise to remove snow and ice from the premises, each of them triggers section 324A.

¶ 62    When applied to the facts here, section 324A means this: CPS and Four Seasons are liable in tort if (1) they made a contractual promise to perform snow-removal services at the Metra Station (2) for the protection of Metra customers, and (3) a Metra customer is injured as a result of (4) their failure to perform that service with reasonable care, and (5) either the customer or Metra relied on their promise to remove the snow or ice.

¶ 63    Here, in its property management contract with Metra, CPS agreed that "one of the primary purposes and inducements for [Metra] to enter into this Agreement is to require [CPS] to assume the duties and risks associated with seasonal *and excessive* snow and ice accumulation and removal." (Emphasis in original.) More specifically, the contract, under the heading "Snow and Ice Removal," provided that

> "[t]he accumulation of two (2) or more inches of snow must be plowed and removed from all spaces within the Facilities and the Facilities salted no later than 5:00 A.M. each day. Salting shall also occur whenever there is a threat of ice forming on the Facilities or Metra notifies [CPS] of inadequate salting. If snow or ice is not plowed and removed, or inadequate salting performed, [CPS] shall be in default and shall have until 9:30 AM to cure the default."

¶ 64    The contract specifically contemplated that CPS would use subcontractors to carry out this service, requiring that CPS provide Metra "a list of all subcontractors hired to perform snow and ice removal for each Facility" as well as the executed subcontracts themselves.

¶ 65    In its subcontract with CPS, Four Seasons was required to "remove ice, snow and related accumulation from the (i) entrances and exits to the Facilities, (ii) traffic lanes and parking spaces at the Facilities, to the extent possible \*\*\* and (iv) any agreed upon walkways accessing or connected to the Facilities." The facilities' "surfaces are to be plowed to bare pavement, to the extent reasonably possible." It provided that "[s]alt will be applied when slippery or icy conditions exist" and that "[a]ll areas will be cleared of snow and icing conditions as soon as possible trying to do same before 8 am if possible."

¶ 66    So we have established that (1) Metra contracted with CPS, and CPS subcontracted with Four Seasons, to remove snow and ice from the Metra Station and (2) these snow-removal

contracts would be reasonably understood as being for the protection of third parties like Mickens. See *Allen*, 2017 IL App (1st) 163340, ¶ 30; *Eichler*, 167 Ill. App. 3d at 691-92.

¶ 67    That leaves three elements of section 324A, namely, whether (3) Mickens was injured as a result of (4) the contractor's "failure to exercise reasonable care" in performing its service, and whether (5) Metra relied on CPS to perform this service, as did Metra or CPS on the subcontractor, Four Seasons.

¶ 68    The evidence shows that Mickens was injured. Whether the contractors exercised reasonable care is typically a question of fact. That is particularly true in this instance, given that above, we have already found a question of fact as to whether the ice formed unnaturally due to negligent plowing and snow removal. So we likewise find that whether CPS and Four Seasons used reasonable care in performing their snow-removal services is a question of fact.

¶ 69    Whether Mickens's injury was the result of any failure by the contractors to exercise reasonable care is likewise a question of fact (nor do defendants argue otherwise). See, *e.g.*, *Ordman*, 261 Ill. App. 3d at 285 (whether ice caused decedent to fall was question of fact not amenable to summary judgment); *Iseberg v. Gross*, 227 Ill. 2d 78, 87 (2007) (proximate cause is usually jury question).

¶ 70    As for Metra's reliance on CPS to perform this service, the language quoted above appears to indicate reliance, but that issue has not been adequately briefed. It may be a question of law from the language of the contract. See, *e.g.*, *Eichler*, 167 Ill. App. 3d at 692 (finding that easement holder Urban's contractual duty to remove snow and ice was sufficient promise on which landowner could rely). But it may be dependent on factual issues as well. At this stage of summary judgment, we resolve the question in favor of the nonmovant, Mickens.

¶ 71    We would say the same thing of Metra's and/or CPS's reliance on the subcontractor, Four Seasons, to perform the snow-removal services. The language (and indeed, the mere existence) of the contract would suggest reliance, but we need not definitively decide that question. Suffice it, at this point, to say that there is sufficient evidence of reliance for Mickens to survive summary judgment against CPS and Four Seasons.

¶ 72    For these reasons, summary judgment in favor of CPS and Four Seasons was inappropriate.

¶ 73                                                          B

¶ 74    But Mickens says that CPS and Four Seasons would be liable even for a *natural* accumulation of snow or ice because they contractually promised to remove it. That is a question we likewise must answer, or at least should answer, because a factfinder could ultimately conclude at trial that the ice on which Mickens fell was a natural accumulation, and we should give guidance to the trial court in that event.

¶ 75    We have already explained that a landowner like Metra is not liable for natural accumulations of snow or ice. What about the snow-removal contractor?

¶ 76    As noted, our supreme court has adopted section 324A, and we have repeatedly and consistently applied it to snow-removal cases involving personal injury. See, *e.g.*, *Allen*, 2017 IL App (1st) 163340, ¶ 30; *Eichler*, 167 Ill. App. 3d at 691-92; *Jordan*, 2018 IL App (1st) 180582, ¶ 30; *McBride*, 327 Ill. App. 3d at 997. On its face, obviously, section 324A says nothing about the natural-accumulation rule. It simply says that if you promise to perform a service that is intended for the safety of third parties, and you do not perform that service with reasonable care, you are liable to that third party for any resulting injuries he or she suffered.

- 11 -

Applied here, a snow-removal contractor's failure to remove naturally accumulating snow or ice after promising to do so, leading to a third person's injury, could result in the contractor's liability to that third person.

¶ 77 Granted, it is no surprise the natural-accumulation rule is not contained within section 324A, as section 324A is a general restatement of the law, applicable to any number of situations *not* involving snow. See, *e.g.*, *Pippin*, 78 Ill. 2d at 210-11 (applying section 324A to contract to provide security services in public housing for protection of its dwellers); *Scott & Fetzer*, 112 Ill. 2d at 388-91 (contract to install and maintain fire-warning systems in warehouse).

¶ 78 Still, the fact remains that section 324A does not, itself, incorporate the natural-accumulation rule. We would have to import into this restatement section an exception for contractual promises regarding snow and ice removal. Should we do so? On close scrutiny, we think the answer is no, for two distinct reasons.

¶ 79                                                     1

¶ 80 First, consider again the natural-accumulation rule itself. It is a sensible, well-grounded rule, but it is undeniably a special rule for snow and ice, contrary to the normal duty of any landowner to use reasonable care in tending to its premises. That is, typically, if an unsafe condition persisted on a landowner's property, that landowner could be held liable for its failure to use reasonable care to remedy that dangerous condition; that is the hallmark of the premises-liability doctrine.

¶ 81 But not so with snow and ice. No matter how dangerous a condition the snow or ice presents, we do not require landowners to remove it. And why? Because it would be unreasonable to do so. Because in Illinois, snow can fall unpredictably and heavily, and temperatures can fluctuate quickly and widely. Snow could fall during the day, while a landowner is at work, unable to remove it and perhaps even unaware of its existence. It could fall on property owned by someone who is elderly or infirm and thus physically unable to remove it. A landowner might not have the financial resources to pay someone else to shovel it. It could fall in such tremendous blankets, in so short a time, that even the most diligent landowner might not have the time, resources, or ability to fully and promptly remove what could be multiple inches or even feet of snow. And the next day, the temperatures could rise 15 degrees, and suddenly all this snow is melting, only to refreeze into sheets of ice when the temperatures drop later that night. See, *e.g.*, *Murphy-Hylton*, 2016 IL 120394, ¶ 19; *Hussey*, 2018 IL App (1st) 170437, ¶ 18; *Tzakis*, 356 Ill. App. 3d at 748; *Lapidus*, 115 Ill. App. 3d at 801.

¶ 82 All sorts of scenarios are possible, involving all sorts of landowners. So in Illinois, as in some other jurisdictions, we make it simple, a bright-line rule: landowners do not have to remove naturally accumulated snow and ice. A public policy doctrine, and a good one. It makes perfect sense to immunize landowners from what could be a tremendously onerous duty to constantly stay on top of these rapid changes in weather and go to the effort of continuously keeping their property clear of snow and ice. As to landowners, the natural-accumulation rule, though a marked departure from the traditional common-law rule of premises liability, is a sensible and workable doctrine.

¶ 83 But as to snow-removal contractors? The accumulation of snow or ice is not a burden or a distraction to them; it is the start of a workday. It is what they are paid to do and trained to do.

They promised that when snow fell, they would clear it away. And many (like CPS and Four Seasons here) are paid for each time they perform the service—so more snowfall means more business. The rationale for the natural-accumulation rule falls completely flat in the context of snow-removal contractors. To lump your average landowner in with a contractor who depends on snowfall for its living does not make any sense at all.

¶ 84 And section 324A, at least as applicable here, only kicks in if there is reliance by the landowner on the contractor's promise to remove the snow. The reliance is key because the giving of that promise by the contractor has induced the landowner not to take *other* steps to remove the snow. Particularly, as here, in a commercial setting, few businesses would tolerate sizeable accumulations of snow or ice on their property without doing something to remedy it, else they would lose business. If they hire Contractor A, they do not take other steps, such as hiring Contractor B or using one of their own employees to shovel the snow. So it is not simply that the landowner chose not to remove the snow; it actually intended to do so by hiring the snow-removal contractor and relying on the contractor's promise to do it.

¶ 85 As a comment to section 324A explains, with our brackets to apply it to our case:

> "The [contractor] is also subject to liability to a third person where the harm is suffered because of the reliance of the [landowner] for whom he undertakes to render the service *** upon his undertaking. This is true whether or not the negligence of the [contractor] has created any new risk or increased an existing one. Where the reliance of the [landowner] *** has induced [the landowner] to forgo other remedies or precautions against such a risk, *the harm results from the negligence as fully as if the [contractor] had created the risk*." (Emphasis added.) Restatement (Second) of Torts § 324A cmt. e, at 144 (1965).

¶ 86 This comment e explains that, while the failure of a landowner to remove natural accumulations of snow or ice is mere passivity or inaction, a *contractor's* failure to do so after promising to do so, and after inducing reliance from the landowner based on that promise, is more than mere inaction but is, in fact, no different than "creat[ing] the risk" itself.

¶ 87 We do not see why we should import the natural-accumulation rule into section 324A, thereby immunizing snow-removal contractors who fail to remove naturally accumulated snow or ice as if they are on the same footing as your average landowner, when of course they are not.

¶ 88                                                              2

¶ 89 There is a second and independent reason why we would not apply the common-law doctrine of natural accumulation here: because the common law should have nothing to do with this conversation. We are talking here about a duty *voluntarily assumed*. And as we have already noted, when the duty stems from a voluntarily undertaking, it is the scope of that undertaking, *not* the common law, that defines its boundaries. *Frye*, 153 Ill. 2d at 32; *Pippin*, 78 Ill. 2d at 210; *Schoondyke*, 89 Ill. App. 3d at 645.

¶ 90 Take, for example, our supreme court's decision in *Wakulich v. Mraz*, 203 Ill. 2d 223, 227 (2003), where a minor died after drinking alcohol at the defendants' home. The plaintiffs, the minor's parents, claimed two sources of a duty owed by the defendants to their daughter—a common-law duty as social hosts and a duty voluntarily undertaken to care for her after she got drunk and sick. *Id.* The supreme court affirmed the dismissal of the counts based on

common-law duty, in light of its holding in *Charles v. Seigfried*, 165 Ill. 2d 482 (1995), that generally bars social-host liability. *Wakulich*, 203 Ill. 2d at 237.

¶ 91 But the supreme court upheld the counts alleging a duty based on voluntary undertaking. The defendants argued that the social-host liability bar should dispose of all counts, including the voluntary-undertaking theory of duty, which was merely an attempt to "circumvent" the social-host doctrine. *Id.* at 241-42. The supreme court made clear, however, that under the voluntary-undertaking theory, "[t]he liability of defendants, if any, is not contingent on their status as social hosts," which was "irrelevant." *Id.* at 242. "Rather," the court reasoned, "defendants' liability arises by virtue of their voluntary assumption of a duty to care for [the minor] after she became unconscious, irrespective of the circumstances leading up to that point." *Id.*

¶ 92 The defendants then argued that "no special relationship" existed between the defendants and the minor that would impose a duty on the defendants to seek medical assistance for her, to which the supreme court again replied that the plaintiffs were not seeking to impose a common-law duty of any sort in these counts, but rather were alleging the defendants "*voluntarily* undertook to care" for the minor. (Emphasis in original.) *Id.* "In other words, having undertaken to care for [the minor], defendants were obligated to exercise due care in the performance of that undertaking." (Internal quotation marks omitted.) *Id.*

¶ 93 The supreme court reiterated this point in *Bell*, 2011 IL 110724, ¶ 17, a case with similar facts, where again the court rejected the notion that the prohibition on social-host liability had anything whatsoever to do with the voluntary-undertaking counts; whether the defendants were social hosts was " 'irrelevant for purposes of plaintiff's voluntary undertaking counts.' " *Id.* (quoting *Wakulich*, 203 Ill. 2d at 242).

¶ 94 What is true of the social-host doctrine is true of the natural-accumulation rule. They are doctrines related to the common-law duty of care owed by a premises owner or occupier. And they both fall by the wayside when the duty is imposed not by the common law but by a voluntary undertaking. Once a defendant voluntarily undertakes a duty, it is the scope of that undertaking, and nothing else, that defines the duty. *Frye*, 153 Ill. 2d at 32; *Pippin*, 78 Ill. 2d at 210. Common-law doctrines, at that point, are " 'irrelevant.' " *Bell*, 2011 IL 110724, ¶ 17 (quoting *Wakulich*, 203 Ill. 2d at 242).

¶ 95 So if, as here, a voluntary undertaking is based on a contractual promise, the scope of the voluntarily assumed duty is defined by the contractual promise. We should not be talking about common-law doctrines like the natural-accumulation rule. We should be asking what duty the contracting party assumed. We should be looking at the language of the contract.

¶ 96 A good example of this is *Eichler*, 167 Ill. App. 3d 685, a slip-and-fall outside a shopping center on naturally accumulated ice that ultimately involved multiple landowners and contracts. One of the entities, Urban, had agreed in a written easement with the landowner that it would perform " 'the prompt removal of all *** snow and ice.' " *Id.* at 688. So summary judgment, based on lack of duty, was inappropriate, even though the ice had naturally accumulated, because under section 324A, Urban had voluntarily undertaken by contract to remove all snow and ice—even natural accumulations—and the other contracting party had relied on that promise, and thus Urban owed a duty of reasonable care in performing that undertaking. *Id.* at 692.

¶ 97 Notably, we also reasoned that section 324A could impose liability on the snow-removal contractor, Wellhausen, with whom Urban had entered into a contract to remove snow from

- 14 -

the lot. *Id.* But we looked at the language of Wellhausen's snow-removal contract with Urban and found that "Wellhausen contracted to remove snow only, not ice." *Id.* That language defined the scope of Wellhausen's voluntarily assumed duty; it did not include the removal of ice; so Wellhausen had no duty to remove ice. *Id.* Because it was undisputed that the plaintiff had slipped on ice, and Wellhausen's duty did not extend to ice removal, summary judgment for Wellhausen was appropriate. *Id.*

¶ 98　　That, in our view, is the proper analysis. Section 324A imposes liability for voluntary promises to perform services that should be understood as for the protection of third parties, which in the case of a written contract is defined by the terms of that contract. The contractual language should be the governing principle and nothing else.

¶ 99　　Another example is *Burke v. City of Chicago*, 160 Ill. App. 3d 953 (1987), where the plaintiff airline employee slipped on ice at Midway Airport in Chicago. The plaintiff sued the city and the snow-removal contractors engaged by the city. The city owned the municipal property, of course, and had leased it to Northwest Airlines. *Id.* at 954-55. The snow-removal contractors had plowed the area where the accident occurred a few hours before the plaintiff slipped; the evidence showed that some snow either had freshly fallen in the interim or had remained from the initial shoveling, and it had turned to ice. *Id.* at 957. The lease between the city and Northwest Airlines placed on the city the responsibility for the "removal of snow, etc. 'as reasonably may be done.' " *Id.*

¶ 100　　This court found no evidence in the record that the snowplowing a few hours before the plaintiff fell had been conducted negligently. *Id.* ("There is no evidence indicating that the snow that turned to ice was a result of piling, bad design of the ramp, or other acts of negligence by the plowers."). That, in the eyes of the court, was fatal to the plaintiff's ability to establish a breach of duty to "reasonably" remove snow:

> "In order to deduce defective plowing in this case, the court would have to conclude that the city or its contractors had a duty to remove all the snow during the plowing operation. *That is not the duty assumed by its lease* with Northwest Airlines, [the plaintiff's] employer. The duty that was assumed by the lease was removal of snow, etc. 'as reasonably may be done.' " (Emphasis added.) *Id.*

¶ 101　　Again, the *Burke* defendants owed no duty to remove all snow, *not* because of a common-law natural-accumulation rule, but because the *contractual promise* was simply to "reasonably" remove snow. The contract, not the common law, dictated the result.

¶ 102　　We followed *Eichler* and *Burke* in *Crane*, 228 Ill. App. 3d 325. No written contract existed between the landowner and the snow-removal contractor, Lootens, but we reasoned that the oral agreement contained a promise to use reasonable care to remove snow. *Id.* at 329. Because the voluntary undertaking was to reasonably remove snow, as in *Burke*, it did not extend to removing *all* snow. *Id.* at 329-30.

¶ 103　　　　　　　　　　　　　　　　　　　　3

¶ 104　　We acknowledge that our emphasis on the language of the contract to define the scope of the snow-removal contractor's duty is inconsistent with some case law in Illinois, which has applied the natural-accumulation doctrine in this context to override the contractual undertaking. Most importantly and recently, in *Jordan*, 2018 IL App (1st) 180582, ¶ 35, this court held that "merely entering into a snow removal contract does not create in the contracting

parties a duty to protect third parties from natural accumulations of snow and ice, at least where the third parties did not personally rely on the contract."

¶ 105     The court used the plural—"contracting parties." To be clear, we emphatically agree that a *landowner* would not be liable for natural accumulations of snow and ice, based on the longstanding common-law natural-accumulation rule (absent some direct promise between the landowner and plaintiff, as in *Schoondyke*). To that extent, we certainly concur with *Jordan*. Nothing we are saying here should be understood as interpreting section 324A to undermine the natural-accumulation rule that applies to *landowners*.

¶ 106     Indeed, section 324A does not even address a landowner's liability. The landowner does not make the promise in this contract to remove snow and ice; the snow-removal contractor does, and the landowner relies on it. The landowner is the "other" in that provision—the "other" for whom the snow-removal contractor promises to provide a service, and who relies on that promise. Restatement (Second) of Torts § 324A (1965). Section 324A concerns three parties—the "one who undertakes *** to render services" (here, the snow-removal contractor) to "another" (here, Metra), which services should be recognized as for the protection of a "third person" (here, Mickens, the Metra customer). *Id.* And the restatement addresses the circumstances in which the "one who undertakes *** to render services" is "subject to liability to the third person." *Id.*

¶ 107     Section 324A, then, only addresses the liability of the snow-removal contractor, not the landowner. And to the extent that *Jordan* held that the natural-accumulation rule would immunize the *snow-removal contractor* from its promise to remove natural snow or ice accumulations, we respectfully reach the opposite conclusion.

¶ 108     As explained above, section 324A makes no provision for the natural-accumulation rule itself, obviously (it is a general restatement), but more importantly, the rationale for that rule is absent as applied to a contractor who is being paid to remove snow and ice. And superimposing a natural-accumulation rule over a contractual promise to remove snow and ice runs directly against the idea that liability for a voluntary undertaking is limited to the scope of the undertaking, instead injecting into this contract a common-law caveat to which the parties never agreed. And no small caveat, either. If a landowner contracts with a snow-removal contractor to remove natural snow and ice accumulations, is not the clear and obvious expectation that the snow-removal contractor will do just that? At least use reasonable care in doing it? And the landowner relies on that promise, thereby forgoing other measures to remove the snow or ice, a key component of section 324A.

¶ 109     The court in *Jordan*, 2018 IL App (1st) 180582, ¶ 38, after reviewing case law, found that public policy supported the result it reached. The court reasoned that *not* imposing the natural-accumulation rule in this context would "discourage (i) landowners from arranging for the removal of natural accumulations of snow and ice and (ii) contractors from agreeing to provide such services" and would "expose the contracting parties to countless claims for falls caused by natural accumulations" of snow or ice. *Id.*

¶ 110     We agree with the first prong of that reasoning, insofar as it applies to landowners. But a landowner's liability is not addressed in section 324A. So our view would not affect the common-law natural-accumulation rule that applies to landowners.

¶ 111     But regarding snow-removal contractors, we do not see why public policy would frown on holding them liable when they fail to exercise reasonable care in the performance of their snow-removal service. Tort law does that all the time. Yes, our winter weather is unpredictable and

harsh, so we could have multiple instances each season of heavy snowfall and ice accumulation, opening up these contractors to potential litigation for personal injuries. But unlike landowners, who have no choice but to grudgingly deal with this harsh weather, snow-removal contractors are in business for this very reason—they want it to snow—and presumably they understand that they must do their work and do it with reasonable care. We do not see how the imposition of liability under section 324A would cause any sort of unfair floodgate of litigation.

¶ 112   In fairness, *Jordan* did not operate in a vacuum. The court there quite reasonably recognized that other case law has immunized snow-removal contractors when they fail to remove natural snow or ice accumulation. In our view, however, many of these earlier decisions either did not substantively consider the question or have been misunderstood over the years as saying something they did not say. And in other instances, we respectfully disagree with their conclusions. Our disagreement is as much with these earlier decisions on which *Jordan* relied as it is with *Jordan* itself.

¶ 113   Principal among these earlier decisions is the oft-cited *McBride*, 327 Ill. App. 3d 992. But the court there did not determine on its own that the natural-accumulation rule applied to snow-removal contractors so much as it found that other cases had so concluded and that the plaintiff had not cited any case law to the contrary. *Id.* at 996-97. Another case, *Strahs v. Tovar's Snowplowing, Inc.*, 349 Ill. App. 3d 634, 638-39 (2004), likewise merely stated what it recognized as a rule of law without independent consideration of whether that rule was warranted, citing *McBride* in doing so.

¶ 114   One of the cases *McBride* cited, as did *Jordan*, was our decision in *Wells v. Great Atlantic & Pacific Tea Co.*, 171 Ill. App. 3d 1012, 1014 (1988), where the plaintiff slipped on ice in a parking lot owned by the A&P supermarket. A&P had contracted with Robert Vasser to perform snow-removal services. The court in *Wells* never mentioned section 324A; indeed, the court did not think that the contractual promise Vasser made to A&P had any bearing whatsoever on Vasser's liability to the plaintiff: "His obligation to comply with the contract was owed to A&P, not to plaintiff ***." *Id.* at 1019. As a matter of contract law, that is true, but that observation did not address a *tort* duty imposed by section 324A for a voluntarily assumed duty for the protection of third parties.

¶ 115   The court in *Wells* followed up that incomplete statement with this: "Vasser's duty to plaintiff was to abstain from negligence. Consequently, absent evidence of an unnatural accumulation or negligent plowing operations, there is no showing of an existing duty on the part of the defendants." *Id.* We agree, to be sure, that Vasser (or anyone else, for that matter) had a common-law duty not to come onto someone else's property and create an unnatural and dangerous condition. But *Wells* did not in any way discuss a duty imposed by a voluntary (contractual) undertaking to remove snow and ice. It did not mention section 324A or discuss the principles emanating from that restatement provision. It did not examine the language of contract between A&P and Vasser. It was little more than a no-privity-of-contract ruling, when section 324A, like it or not, extends tort law far beyond that.

¶ 116   Both *Jordan* and *Wells* also relied on *Burke*, 160 Ill. App. 3d 953, where the plaintiff airline employee slipped on ice at Midway Airport in Chicago. As we explained above, however, *Burke* did *not* hold that the natural-accumulation rule immunized the snow-removal contractors. The common law had nothing to do with the outcome. The contract there placed on the defendants the responsibility for the "removal of snow, etc. 'as reasonably may be

done.' " *Id.* at 957. Because the evidence showed that the defendants plowed the snow before the plaintiff's fall, and there was no evidence that they did so unreasonably, the plaintiff could not establish a breach of duty, and summary judgment for all defendants was appropriate. *Id.*

¶ 117 Thus, although the court in *Burke* never cited or discussed section 324A, that decision supports our view that, when considering the scope of a defendant's liability for a duty voluntarily undertaken by contract, the language of the contract is all that matters.

¶ 118 We also note that the decision in *Crane*, 228 Ill. App. 3d 325, has been cited by several of these decisions for the proposition that the natural-accumulation rule immunizes snow-removal contractors. As explained earlier, *Crane* supports our position. It was based on the terms of a contract (albeit an oral one) by which Lootens had only agreed to remove snow in a "reasonable" manner, and thus his duty was limited accordingly. *Id.* at 329-30. In other words, Lootens had no duty to eliminate all snow from the premises, but that conclusion was based *not* on the natural-accumulation rule but on the terms of the contractual undertaking he made.

¶ 119 *Jordan* also cited our decision in *Flight v. American Community Management, Inc.*, 384 Ill. App. 3d 540, 544 (2008), where this court affirmed summary judgment for a snow-removal contractor in a slip-and-fall occurring outside a condominium building. We view *Flight* as a good example of the flaws in artificially inserting the natural-accumulation rule into an analysis of liability for snow-removal contractors.

¶ 120 The court there acknowledged, first, that "where a contractor has entered into a contract to undertake snow removal, the scope of the duty is determined by the terms of the contract." *Id.* With that, we entirely agree; that is precisely our point. But in the next breath, the court wrote: "Where a duty has been imposed on a snow removal contractor, the duty was *only* not to negligently remove snow by creating or aggravating an unnatural accumulation of ice and snow." (Emphasis added.) *Id.*

¶ 121 That one-two punch of sentences exposes the problem. The first sentence states an unassailable legal principle that countless decisions have reiterated—a voluntary undertaking is limited to the scope of the undertaking, so if the undertaking is based in contract, the language of the contract governs the scope of the assumed duty. And so, under section 324A (which *Flight* never mentioned), it is that voluntarily assumed duty that the contractor must exercise with reasonable care. But that next sentence in *Flight* has nothing to do with the specific language of any contract; it is a general statement that the "only" duty of that contractor, apparently regardless of what the contract says, is to "not *** negligently remove snow by creating or aggravating an unnatural accumulation of ice and snow." *Id.*

¶ 122 We cannot agree with an analysis that pivots from focusing on the contract for the source of duty, in the first sentence, to not caring at all what the contract says and imposing some bright-line rule, in the second. A snow-removal contract could contain any number of obligations—remove all snow and ice, snow only, ice only, snow over two inches, salt the ice but do not remove it, use "reasonable efforts" to remove snow—and we should not paint all contracts with the gloss that the "only" duty is to not create an unnatural condition. No doubt that is *part* of the duty. The duty, under section 324A, to use reasonable care in performing snow and ice removal would surely *include* not creating unnatural and dangerous hazards. But it excludes everything else? That cannot be.

¶ 123 Say, for example, the contract required the removal of snow and ice down to the pavement, and the snow contractor removed the snow but left an inch-thick sheet of natural ice entirely intact. Would not that constitute, under section 324A, the failure to exercise reasonable care in

- 18 -

performing its duty to remove ice? Of course it would. Leaving the ice entirely untouched would fall pretty far short of using reasonable care to remove it. So if that failure resulted in injury to a third party who slipped on the ice, it should be an elementary matter to say that section 324A imposes liability on that contractor for that injury, right?

¶ 124 Right—unless we superimpose a natural-accumulation rule over the contract language. Under the natural-accumulation rule, that contractor—the one who specifically promised to remove ice, and whom section 324A holds to a duty of reasonable care in performing that undertaking—would walk scot-free, simply because the ice had never changed from its natural state. The contractor is rewarded for not doing what it promised to do. The contract language, in other words, has suddenly gone from being the one and only thing that defines the contractor's voluntarily assumed duty to being utterly irrelevant, replaced by a common-law doctrine originally created *not* for companies that remove snow and ice for a living but for landowners.

¶ 125 In sum, the case law discussed above either did not employ the natural-accumulation rule to override a contractual promise to remove snow and ice (though in some instances has been interpreted as having done so), did so without substantive consideration of the question, or did so based on reasoning with which we respectfully disagree.

¶ 126 Suffice it to say that we do not see any reason to force a common-law doctrine like the natural-accumulation rule into an analysis of a tort duty created by a voluntary contractual undertaking to remove snow or ice. The rationale for the natural-accumulation rule has no application to snow-removal contractors. And the common law has no place in the consideration of a duty that, by definition, was not created by the common law in the first place but rather was created by (and is thus limited to) a voluntary, contractual assumption of duty.

¶ 127 Thus, insofar as section 324A governs liability for a contractor's promise to remove snow or ice from a landowner's property, the common-law natural-accumulation rule has no application. The guiding star should be the scope of the contractual promise and whether, under section 324A, the contractor reasonably performed that promise.

¶ 128 Earlier case law such as *Eichler*, *Burke*, and *Crane* are consistent with that view—they faithfully applied the language of the contract in determining the contractor's duty—but they have been misinterpreted as doing the opposite, as requiring natural-accumulation immunity for snow-removal contractors. The original premise of those decisions was correct, and we should return the law to that place.

¶ 129 C

¶ 130 All of this means, then, that a discussion of natural-versus-unnatural accumulation, while decisive in determining the liability of the landowner, Metra—who had no contract with Mickens and is not alleged to have made any representations or promises to Mickens—is irrelevant when considering the liability of one who has contractually promised to remove snow or ice. What matters is what the contractor promised to do in the snow-removal contract, whether there was reliance on that promise, whether the contractor performed that undertaking with reasonable care, and whether any failure to exercise reasonable care resulted in harm to Mickens. See Restatement (Second) of Torts § 324A (1965).

¶ 131 As we already pointed out above, the liability of CPS and Four Seasons, governed as it is by section 324A, is open at this stage to several questions of fact: (1) whether either of them

failed to exercise reasonable care in the performance of their contractual undertakings; (2) whether Mickens was injured as a proximate cause of any failure by the defendants to exercise reasonable care; and (3) whether Metra or, in the case of the subcontract, Metra and/or CPS relied on these contractual promises to perform snow and ice removal (this latter question may ultimately be a question of law, but we leave that to the trial court).

¶ 132    For these reasons, it was error to enter summary judgment in favor of CPS and Four Seasons.

¶ 133                                    CONCLUSION

¶ 134    Because there is a question of fact as to whether the ice on which Mickens slipped was the product of a natural or unnatural accumulation, summary judgment for Metra, the landowner, was improper. For the reasons we have given above concerning the duties of CPS and Four Seasons, as well as the remaining questions of material fact we have identified above, summary judgment should not have been granted in favor of CPS or Four Seasons, either.

¶ 135    The judgment of the trial court is reversed. The cause is remanded for further proceedings.

¶ 136    Reversed and remanded.