2024 IL App (1st) 221453-U

SECOND DIVISION
March 12, 2024

No. 1-22-1453

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | |
|---|---|
| JONATHAN MOSCOVITCH, | ) |
| | ) |
| Plaintiff-Appellant, | ) Appeal from the Circuit Court of |
| v. | ) Cook County, Illinois, County |
| | ) Department, Law Division |
| WESTFIELD, LLC, WESTFIELD AMERICA | ) |
| G.P., INC., WESTFIELD PROPERTY | ) |
| MANAGEMENT, LLC, SNOW SYSTEMS, | ) No. 2020 L 009288 |
| INC., and OLD ORCHARD URBAN LIMITED | ) |
| PARTNERSHIP, | ) |
| | ) Honorable |
| Defendants. | ) Gerald Cleary, |
| | ) Judge Presiding. |
| (Snow Systems, Inc., Defendant-Appellant). | ) |
| | ) |

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Howse and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*: Affirmed. Court properly entered summary judgment in favor of snow-removal company. Undisputed facts showed that company complied in all respects with snow-removal contract with shopping mall owner.

¶ 2    Plaintiff Jonathan Moscovitch suffered serious injuries after slipping and falling on an

accumulation of snow and ice outside a restaurant in a shopping mall in Skokie, Illinois. He sued

not only the owner of the shopping mall but the snow-removal company with whom the owner contracted to remove snow and ice from the premises.

¶ 3    The snow-removal contractor moved for summary judgment, arguing that the scope of its duty in tort was limited to its contractual undertaking with the mall owner, and the undisputed evidence demonstrated that the contractor complied with the terms of that contract in full. The trial court agreed and entered summary judgment in favor of the snow-removal contractor. We agree as well and affirm.

¶ 4                                    BACKGROUND

¶ 5    On January 17, 2020, plaintiff ate dinner with his wife and some friends at the Roka Akor restaurant in the Old Orchard shopping mall. He arrived at approximately 7:30 pm, by which time snow had fallen for a few hours at least. He left the restaurant at around 10:45 pm. He had not consumed any alcohol; as a rule he did not.

¶ 6    After dinner, he walked to his car in the nearby east parking lot. The lot had not been salted or plowed. Plaintiff slipped on a smooth sheet of ice beneath the snow. The asphalt where he slipped, it was later determined, contained a depression where water had filled, then frozen into ice before being blanketed by snow.

¶ 7    Plaintiff fractured his shoulder in the fall and was taken to the hospital. His injury required surgery, including the placement of a metal plate and screws in his shoulder.

¶ 8    Plaintiff sued the owner of the shopping mall, Westfield Property Management, LLC ("Westfield"), as well as Snow Systems, Inc., a snow-and-ice-removal company with which Westfield contracted to remove snow and ice from the Old Orchard property.

¶ 9                                    I. The Contract

¶ 10    Well before this incident, Westfield and Snow Systems had entered into a written contract defining the terms and scope of the work. The contract contemplated the involvement, as well, of an engineering firm hired by Westfield to supervise maintenance at the shopping mall, Able Engineering (Able).

¶ 11    The contract provided that the "contractor," Snow Systems, "agrees to perform the services specifically described on Exhibit A, attached hereto and incorporated herein by reference."

¶ 12    Exhibit A, entitled "Scope of Services and Schedule of Performance," provided that, if a snowfall of greater than one inch were anticipated, "Able calls contractor who then dispatches staff to site at specified time," that "[c]ontractor responds within 2 hours of notification," and that "[c]ontractor is responsible for snow removal and salting of all parking lots, roads, entrances, service yards, interior mall, and sidewalks."

¶ 13    Exhibit A provided, for anticipated snowfall of one inch or less, that "Able calls contractor to salt parking lots, roads, entrances, and service yards, as needed, determined by Able. Contractor to be on site within 1 hour to ensure mall is maintained clear."

¶ 14    The "general" terms of Exhibit A included the following:

▪ "Each contractor who works on property must sign in/out with security each time there is a snow event."

▪ "Contractor will provide labor for sidewalk cleaning and salting as directed by Center Management."

▪ "Work shall be performed during the night or early morning hours."

¶ 15    The "general" terms of Exhibit A also contained this: "Snow to be plowed based on

priority map attached." As promised, a priority map was attached to the exhibit and thus to the contract. The areas given "priority 1" status included the ring road and roadway entrances into the shopping mall. (The "ring road" is the road within the shopping mall property that encircles the mall, allowing customers to reach different parts of it by car without traveling through the parking lots.)

¶ 16    The various parking lots in the mall were also given various priorities; the Roka Akor parking lot where plaintiff's injury occurred was given "priority 2" status.

¶ 17    Finally, though Exhibit A to the contract contained "general" provisions, the contract itself contained several "general" provisions as well. The "manager" referenced below meant Westfield. Relevant here are the following:

> ▪ "Contractor agrees that its Services shall be scheduled and performed only as authorized by Manager in Manager's sole and absolute discretion. If Manager determines that work proposed by Contractor will be disruptive if performed while the Shopping Center is open for business, than Contractor shall perform the proposed work during times when the Shopping Center is not open for business as Manager may direct."

> ▪ "Contractor agrees to punctually, diligently and fully perform all of the Services at the time scheduled by Manager, which shall be subject to change by Manager as it deems, in its sole discretion, necessary or convenient to the overall operation and maintenance of the Shopping Center."

¶ 18    Snow Systems was granted this contract after a competitive bidding process. Snow Systems had no input into any provisions of the contract but accepted the contract as is.

¶ 19                              II. The Parties' Performance of the Contract

¶ 20    The record includes deposition testimony from individuals from Westfield, Able, and

Snow Systems who had knowledge of the snow-removal process at the shopping mall. The deponents agreed that the authority to determine when Snow Systems would dispatch to Old Orchard for services was made by Westfield or its agent, Able—but *not* by Snow Systems. That was the sworn testimony of Westfield's general manager, Serge Khalimsky; Able's assistant maintenance supervisor for Old Orchard, Bill Knierim; and Tom Walsh, who at the relevant time was the Snow Systems area manager responsible for the region including Old Orchard.

¶ 21    Khalimsky testified that he relied on the expertise of Able to coordinate snow and ice removal with Snow Systems. He agreed that "Westfield gave Able the authority to deal with Snow Systems and arrange snow and ice control services on a day-to-day basis[.]" He likewise agreed that "Able managed the snow and ice control relationship with Snow Systems on Westfield's behalf so that Westfield didn't have to do so on a day-to-day basis during winter months[.]" To the extent that a Westfield employee engaged with Able, it was not Khalimsky but Westfield's facility director, Hugh Lafferty.

¶ 22    Bill Knierim of Able testified that typically, before Snow Systems would be dispatched to Old Orchard, a representative of Westfield, Able, and Snow Systems would talk by conference phone call. Westfield or Able, if Westfield were not present, would have the final say in when Snow Systems would be deployed, how many Snow Systems employees would be deployed, and what equipment they would use, consistent with the contract. But as the Westfield general manager, Khalimsky, noted, Westfield and Able would sometimes solicit the input of Snow Systems given its expertise in the matter.

¶ 23    Tom Walsh, the Snow Systems area manager, and Miguel Cabral, one of the Snow Systems employees originally dispatched to Old Orchard on the night in question (and who had worked for Snow Systems at Old Orchard since 2017 or 2018), each testified that they were

directed by Westfield as to how many Snow Systems employees would be dispatched and at what time. They both also testified that Westfield would typically have Snow Systems bring only two employees at first and then wait until later in the evening to bring in additional employees to push the accumulated snow. They each were of the opinion that Westfield tended to call in Snow Systems far later in the evening than many other commercial clients in the area.

¶ 24                                    III. The Night at Issue

¶ 25     On the night of plaintiff's fall, January 17, 2020, two Snow Systems employees were initially dispatched to Old Orchard, Miguel Cabral and his wife, Destiny. They signed in with Old Orchard security at 6:30 pm. Per the priority map and direction of Westfield/Able, they began by pre-salting the ring road and main roadways. Miguel drove the truck, Destiny was the operator—meaning she filled and refilled the salt that was being dropped on the pavement. Miguel testified that it was common to pre-salt roads before an impending snowstorm.

¶ 26     Between 2:00 and 3:00 am the following morning, seven additional Snow Systems employees arrived. Miguel testified that it was not unusual for two workers to arrive first and conduct pre-salting before additional employees arrived—particularly when, as that night, the snowfall grew heavier as time wore on, resulting in greater accumulations. The decision to bring additional employees, like the decision to initially bring the two employees, was made by Westfield/Able.

¶ 27     It is undisputed that, at the time of plaintiff's slip and fall—approximately 10:50 pm—the Roka Akor parking lot had not been salted or plowed.

¶ 28                                    IV. Motion Practice

¶ 29     Westfield moved for summary judgment based on the "natural accumulation" rule, a common-law doctrine whereby a landowner owes no duty to remove snow or ice that naturally

accumulates. The circuit court denied that motion, finding a question of fact as to the existence of defects in the pavement—in other words, a question of fact as to whether the snow and ice were the result of natural or unnatural accumulation. That ruling is not before us; the proceedings against Westfield remain pending in the circuit court.

¶ 30    Relevant to this appeal is the motion for summary judgment filed by Snow Systems. Among other things, Snow Systems argued that, under Section 324A of the Restatement (Second) of Torts, the only duty Snow Systems owed to a third-party invitee like plaintiff was to reasonably perform its contract with Westfield. Because the undisputed evidence showed that Snow System reasonably performed its contract, summary judgment was proper. The circuit court agreed and entered summary judgment in favor of Snow Systems.

¶ 31                                      ANALYSIS

¶ 32    Summary judgment is proper when the pleadings, depositions, and admissions on file, together with any affidavits, construed in the light most favorable to the non-movant, show that there is no genuine issue of material fact, and the movant is entitled to a judgment as a matter of law. *Id.* To survive a motion for summary judgment, a plaintiff need not prove its case, but the plaintiff must present some evidence that would arguably entitle it to judgment. *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 12; see *Land v. Board of Education*, 202 Ill. 2d 414, 432 (2002) ("If the party moving for summary judgment supplies facts that, if not contradicted, would warrant judgment in its favor as a matter of law, the opponent cannot rest on his pleadings to create a genuine issue of material fact."). Our review is *de novo*. *State Bank of Cherry v. CGB Enterprises, Inc.*, 2013 IL 113836, ¶ 65.

¶ 33    Illinois common law has created various rules regarding liability for the removal of snow and ice. For example, generally, owners and occupiers of property owe no duty to remove natural

accumulations of snow and ice from their property. *Murphy-Hylton v. Lieberman Management Services, Inc.*, 2016 IL 120394, ¶ 19. The law relieves landowners of this obligation because, given the harshness and unpredictability of winter weather in Illinois, it would be unreasonable to force them to consistently, immediately, and effectively respond to snowfall and freezing temperatures. *Id.*; *Mickens v. CPS Chicago Parking, LLC*, 2019 IL App (1st) 180156, ¶ 27; *Hussey v. Chase Manor Condominium Ass'n*, 2018 IL App (1st) 170437, ¶ 18.

¶ 34    The law is different regarding snow-removal contractors—individuals or companies that contract with landowners to remove their snow and ice. Illinois long ago adopted Section 324A of the Restatement (Second) of Torts, which provides in pertinent part:

> "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if *** (c) the harm is suffered because of reliance of the other or the third person upon the undertaking." Restatement (Second) of Torts § 324A (1965).

¶ 35    Under section 324A, if Party A contracts with Party B to perform a service that is necessary for the protection of third parties or their property, Party A may be liable to that third party for failing to perform with reasonable care. *Id.* Our supreme court applied section 324A, for example, to a company's contract with the city to provide security services for residents of public housing; the security company owed a duty to those residents, though it had no contract with them. *Pippin v. Chicago Housing Authority*, 78 Ill. 2d 204, 210 (1979). Likewise, a company that installed and maintained a fire-warning system in a warehouse was liable to the other tenants in that warehouse for the damage to their property by fire, though it had no contract

with them. *Scott & Fetzer Co. v. Montgomery Ward & Co.*, 112 Ill. 2d 378, 390-91 (1986).

¶ 36    Illinois has long included snow-removal contracts within the ambit of section 324A, recognizing that a contractor's promise to remove snow from a landowner's property is in large part to protect third parties coming onto the land, particularly given that the landowner relies on the snow-removal contractor and thus does not take other measures to remove the snow and ice. Under Section 324A, a snow-removal contractor who fails to exercise reasonable care in performing its contractual duties is liable to third parties injured as a result. See *Mickens*, 2019 IL App (1st) 180156, ¶ 61; *Jordan v. The Kroger Co.*, 2018 IL App (1st) 180582, ¶ 30; *Allen v. Cam Girls, LLC*, 2017 IL App (1st) 163340, ¶¶ 28-30; *McBride v. Taxman Corp.*, 327 Ill. App. 3d 992, 996-97 (2002); *Eichler v. Plitt Theatres, Inc.*, 167 Ill. App. 3d 685, 691-92 (1988).

¶ 37    In *Mickens*, 2019 IL App (1st) 180156, ¶ 58, we emphasized that a contractual undertaking by a snow-removal contractor is no different than any other undertaking voluntarily assumed—the scope of the duty is limited to the scope of the undertaking. See *Frye v. Medicare-Glaser Corp.*, 153 Ill. 2d 26, 32 (1992); *Pippin*, 78 Ill. 2d at 210. Thus, in determining the liability of a snow-removal contractor to an injured third party who comes onto the land, the contractor's duty is defined and limited by the contractual terms, and its liability then depends on whether it performed those contractual duties with reasonable care. *Mickens*, 2019 IL App (1st) 180156, ¶ 127; Restatement (Second) of Torts § 324A (1965). The natural-accumulation rule for *landowners* has no bearing on the liability of a snow-removal contractor; it is the snow-removal contract, and only that contract, that defines the duty of the snow-removal contractor. *Id.*

¶ 38    Ultimately, then, Snow Systems is liable to plaintiff here if Snow Systems failed to perform its contractual obligations with reasonable care. Relevant here, Snow Systems is entitled to summary judgment unless plaintiff presents some evidence that would arguably entitle it to

judgment—some evidence that Snow System failed to reasonably perform its duties under the contract. *Bruns*, 2014 IL 116998, ¶ 12; *Land*, 202 Ill. 2d at 432.

¶ 39    We agree with the circuit court that the undisputed facts reveal no evidence that Snow Systems failed to perform its contractual obligations with reasonable care. The contract between Westfield and Snow Systems unquestionably appointed Westfield or its agent, Able, as the decisionmaker as to (1) when Snow Systems should be dispatched to Old Orchard; (2) how many Snow Systems employees should be dispatched; and (3) the sequence of the employees' work.

¶ 40    The record reveals no evidence that Snow Systems failed to perform its work with reasonable care. On the day in question, Snow Systems was told to arrive with two employees at 6:30 pm. There is no evidence that the Snow Systems employees (the Cabral spouses) arrived late or at any time other than when they were told to arrive. There is no evidence in the record that the Snow Systems employees did anything other than follow the (contractual) priority sequence of the work, starting with pre-salting the ring road and the roadway entrances into the shopping mall. Nor is there any evidence that the employees performed that initial "priority 1" work slowly, negligently, or in any way inconsistent with the contract.

¶ 41    Plaintiff understandably goes to great lengths to establish a question of fact on the reasonableness of Snow Systems' performance. Among other things, plaintiff retained an expert, Mr. Yandell, who testified via affidavit to a number of opinions, the summary of which we borrow verbatim or nearly so from plaintiff's brief:

> • The salting and plowing at Old Orchard was unsafe and improper;
>
> • "There should have been more than 2 people performing snow and ice control that evening. To only have 2 people present from 6:30 (after the snow had started) to 2 or 3 am salting only the ring road and entrances is unsafe, improper, and a violation of

industry customs and standards;"

• "If the lot had been salted and/or plowed prior to 10:45, as it should have been, there would have been no ice and/or [plaintiff] would have seen it;"

• "To not pre-salt, salt, and plow the Roka Akor east parking lot where [plaintiff] fell prior to 10:30 pm was unsafe, improper, and a violation of industry customs and practices;"

• "The way in which Westfield, Snow Systems (and apparently Able), planned for and prepared for this winter weather event was unsafe and improper;"

• "Westfield and Snow Systems could, and should, have easily salted and plowed the ring road and drives including Roka Akor parking lot drive prior to [plaintiff] encountering the artificial accumulation of ice."

¶ 42    Assuming that each and every one of these criticisms is valid, as we do at this stage of the proceedings, not one of them can be attributed to Snow Systems, which had no control over the order of the work or the time that it arrived. Perhaps the snow removal should have started earlier, with more employees, but these decisions did not belong to Snow Systems.

¶ 43    It is likewise true that, in his deposition, Mr. Khalimsky at times blurred the distinction between Westfield and Able in discussing which entity routinely made the decisions on dispatching Snow Systems to Old Orchard. Aside from the fact that Khalimsky was not the one who typically dealt with Able and Snow Systems—his facility director, Hugh Lafferty did—any blurring of roles is immaterial, because the contract contemplated that either Westfield or Able would direct Snow Systems. The salient and unrebutted point is that, whichever entity was making the final decision on any given day, it was never Snow Systems.

¶ 44    Plaintiff also flags Khalimsky's testimony that the contractual restriction on work being

performed at "night or early morning" was merely a preference, and Snow Systems had worked at Old Orchard during the day during other snowstorms. Again, however, there is no dispute that Snow Systems was at the beck and call of Westfield or its agent, Able; that is the only point that matters.

¶ 45   Finally, plaintiff cites a passage from Khalimsky's deposition to inject a question of fact as to whether Snow Systems had a say in the sequencing or timing of the work. Plaintiff writes, for example, that Khalimsky testified that "Westfield did not restrict Snow Systems['] ability to plow and salt to certain times and he disagrees with Mr. Walsh, the manager of Snow Systems." The passage plaintiff cites reads as follows:

"Q. Did Westfield restrict Snow Systems [*sic*] ability to plow and salt to certain times?

A. Not to my knowledge.

Q. If Tom Walsh used words to the effect of Westfield restricted the ability to do so or to plow and salt at certain times, would you disagree with that?

A. Yes."

¶ 46   That testimony does not strike as nearly as meaningful as plaintiff would read it. For one, Khalimsky testified that it was typically *Able*, not Westfield, who directed Snow Systems, so he could have disagreed with the premise on that point alone. Khalimsky repeatedly testified that Westfield relied on Able's expertise—though again, Khalimsky was not personally the one from Westfield dealing with Able and Snow Systems during snowfalls. For another, the questions were vague; whether Westfield "restricted" Snow Systems "to plow and salt at certain times" could easily be read as asking whether there was a uniform time, every snowfall, that Snow Systems was allowed to work, which obviously was not the case. More to the point, on several occasions during his deposition, Khalimsky was clear, consistent with the testimony of the

deponents from Able (Bill Knierim) and Snow Systems (Tom Walsh), that either Westfield or Able dictated to Snow Systems the time and sequence of the snow-removal work.

¶ 47     We understand our obligation to review the evidence in the light most favorable to the plaintiff, but there is a limit to how far we will allow one statement, plucked from all context and vague at best, to undermine the clear and consistent testimony of each deponent, which was also consistent with the contractual language. We agree with the circuit court that, "[w]hile the witness accounts plaintiff cites may conflict regarding the precise details by which Snow Systems would be called in to clear precipitation, these disputes are not material to plaintiff's claims because the witnesses all agree that Snow Systems did not have the ability to decide when and how it would perform its duties under the contract."

¶ 48     As the unrebutted evidence shows that Snow Systems complied at all times with its contractual duty and at the direction of the landowner or its agent, Snow Systems is entitled to judgment as a matter of law.

¶ 49                                     CONCLUSION

¶ 50     The judgment of the circuit court is affirmed.

¶ 51     Affirmed.