2024 IL App (1st) 232438-U

SECOND DIVISION
December 24, 2024

No. 1-23-2438

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| CHRISTINE TUDELA, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TRON, LLC; WEI KU; and LEXINGTON GREEN CONDOMINIUM ASSOCIATION, | ) ) ) | Appeal from the Circuit Court of Cook County |
| | ) | |
| Defendants and Defendant-Appellee | ) | |
| _____ | ) | 19L63058 |
| | ) | |
| LEXINGTON GREEN CONDOMINIUM ASSOCIATION, | ) ) ) | Honorable Martin S. Agran, Judge Presiding |
| | ) | |
| Defendant/Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BEST LAWNS, INC., | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

JUSTICE McBRIDE delivered the judgment of the court.
Justices Howse and Ellis concurred in the judgment.

## O R D E R

¶ 1    *Held*: Circuit court erroneously granted summary judgment to condominium association and its landscape maintenance contractor where resident's slip and fall on icy driveway posed material question of fact as to whether ice was an unnatural accumulation, and

further erred by dismissing portion of amended complaint which restated negligence, but properly dismissed portion of amended complaint purporting to state willful and wanton conduct.

¶ 2    Christine Tudela was injured when she slipped and fell on the driveway to the condo that she was renting, which she attributed to stepping on a broken icicle that maintenance workers had knocked down from a gutter and negligently left in her path. She sued Lexington Green Condominium Association (Lexington Green or condo association) for creating an unnatural accumulation of ice and the condo association filed a third-party action for contribution from its landscape maintenance contractor, Best Lawns, Inc. When the defendants sought summary judgment, the circuit court *sua sponte* relied on the Snow and Ice Removal Act (745 ILCS 75/0.01 *et seq*. (West 2016)), and determined that, to avoid the statute, Tudela would need to plead willful and wanton conduct and that the defendants were entitled to summary judgment. She contends the ruling was in error, and that although she was allowed to replead to add allegations regarding gutter defects, the court next erred by dismissing the amended pleading as a mere rephrasing of her prior allegations and arguments. Tudela contends that her allegations of willful and wanton conduct were sufficient. Lexington Green and Best Lawns counter that the evidence supported summary judgment of the original complaint and dismissal of the amended complaint. (Best Lawns adopted Lexington Green's brief rather than filing separately.)

¶ 3    Tudela rented and resided at 1558 Seven Pines Road, #A1, Schaumburg, Illinois, a first-floor condominium unit, for five years prior to the accident at issue. Her landlord was the unit's owner and/or manager, Tron, LLC and Mei Ku (a misnomer for Wei Ku). Her original complaint named Tron, Ku, and Lexington Green. Ku responded that Tron had been involuntarily dissolved and that Ku owed no duty to remove snow and ice from the exterior, because landscape

maintenance was the condo association's contractual responsibility. The circuit court granted Ku's motion for summary judgment and Tudela has not appealed that ruling.

¶ 4    The condo complex consisted of 408 units and each of the units was assigned a garage bay with an overhead door and driveway. There were four adjacent garage bays on the front of Tudela's building. When walking out the front door of the building, her garage space was the furthest away of the four.

¶ 5    Tudela slipped and fell on February 12, 2018. The day before, Tudela's husband took photos of long icicles that were hanging from the roof or gutter above the garage doors, with the intention of reporting this situation to their landlord and Lexington Green. Tudela's car was on the driveway overnight when 3-to-4" inches of snow fell. In the morning, it was overcast and above freezing when she and her husband walked uneventfully to her vehicle, at about 10:45 a.m. The long icicles were still hanging from the gutter. When the couple returned from their errands in the late afternoon, it was starting to get dark. She got out of the car, carrying two small shopping bags, while her husband went to collect groceries from the back of the vehicle. She walked along the most level part of the driveway, near the garage doors, toward the short sidewalk that led to the building's front door. Neither of them had complained about the hanging icicles, but while they had been out for the day, the property's landscape maintenance workers had plowed the snow from the driveway and knocked down and removed most of the hanging ice. She lost her footing in front of the first garage door and fell down, breaking her left leg.

¶ 6    In her complaint, she alleged that after her fall, she saw broken chunks of icicle on the driveway. She attributed her accident to stepping on a short piece of icicle that was about half the size of her fist. She claimed that Lexington Green broke off the icicles and negligently left an

unnatural accumulation of ice chunks on the driveway, failed to adequately light the driveway so she could see the chunks, failed to warn of the chunks, failed to remove the chunks, failed to prevent the unnatural accumulation of ice on the driveway, and also failed to inspect the property for this defect. Lexington Green's third-party complaint for contribution brought Best Lawns into the litigation.

¶ 7 In its third-party complaint, Lexington Green denied fault, but alleged in the alternative that Tudela was injured due to Best Lawns' negligent failure to remove snow and ice from the driveway, including icicles and broken icicles; adequately salt; perform its services in a manner that would clear icicle chunks; and reasonably inspect the work it completed the day before Tudela fell and the day that she fell.

¶ 8 About a year after filing suit, Tudela sought leave to amend her pleading with allegations of willful and wanton conduct that would entitle her to punitive damages. She contended discovery revealed a "widespread problem" of "dangerous ice conditions" at the condo complex that Lexington Green had not addressed, in utter indifference to or in conscious disregard for her safety. It is unclear when she first asked the court to rule on the motion, but she states that "[a]t the court's request," her motion remained pending while discovery continued for an additional year.

¶ 9 Discovery included taking Tudela's deposition. She indicated that she wore snow boots, and in the morning, she had no difficulty walking on the driveway near the garage doors. There was no ice on the ground, nor were there any icicles hanging above her garage door (the fourth door), but there were some large icicles hanging above the first garage door. When they got home in the afternoon, the snow had been removed from the driveway. It was not until after she fell that she saw a strip of ice chunks across the width of the first garage, and she realized that she had

slipped on the first of those pieces. The temperature was above freezing at the time. All of the ice that she saw was fused together and it appeared to have melted and then refroze on the driveway. She admitted that she could not recall seeing icicles on her building's garage earlier that winter, although she could recall seeing them elsewhere in the condo complex. She denied seeing icicle pieces on the ground in front of her building in prior winters. She was not aware of anyone who had fallen in front of her garages at any time.

¶ 10    At her deposition, Valerie A. Remmert testified that she had lived in the Lexington Green complex since 1982 and been on its board of directors since 2014. According to Remmert, long icicles form along the garage gutters because the heat tape (an electrified cable placed in the gutter) does not always work. She had seen icicles that were more than 3' long. The heat tape is the responsibility of the association, not the residents. The association is also responsible for ice and snow removal and had contracted with Best Lawns. The association did not have a committee or inspection process to check Best Lawns' work. The association relied on residents to complain to the property manager about icicles and the property manager would also drive around the property looking for problems. If there was an issue with the heat tape, the property manager would ask the association's handyman, Sargon, to come check it. He turned on the heat tape in the late fall and turned it off in the spring. He was not obligated to inspect for icicles. Remmert did not know whether the heat tape at 1558 Seven Pines Road (Tudela's building within the complex) was working or when it had last been checked.

¶ 11    Another deponent was Galdino Ayala, who was a manager for Best Lawns. As a crew supervisor, he usually worked at other sites but sometimes would be assigned to Lexington Green and had performed work at the complex for at least ten years. He sometimes saw big icicles

hanging on the gutters and would call his office to get approval to remove them, but as far as he knew, Lexington Green was responsible for inspecting its own gutters. While standing on the ground, Best Lawns' employees would use a pole to knock down the icicles, push them "toward the grass or toward the edge," and then apply salt. Afterwards, a group foreman for Best Lawns would walk behind to inspect the property. The work crew would not remove ice on the ground or icicles if there were cars in the way. They would never knock down an icicle and just leave it on the ground. However, icicles could fall on their own if they were heavy or if the temperature rose, and Ayala sometimes saw homeowners knock down icicles. If an icicle fell and was not removed, it would freeze in place. If Best Lawns removed snow, it would not inspect the surface for ice.

¶ 12    The parties also deposed Juan Jose Hurtado, who had been employed by Best Lawns as a laborer for 18 years, 15 or 16 of which he had spent working at Lexington Green. He often saw icicles at the condo complex. The crew would "leave them alone" unless a supervisor told them to knock down the icicles. They would use a pole or scraper. Any icicles that did not break free would remain in place. Icicles could fall down by themselves and ice could form on the ground from snow, freezing rain, or when homeowners cleaned snow or ice from their cars.

¶ 13    Michael Cavaliere, Sr., the owner of Best Lawns, testified that his company had been the landscaping contractor for Lexington Green for about 40 years and handled all aspects of its landscape maintenance, including the winter tasks of snow plowing and ice removal. Under its contract, Best Lawns was responsible for removing snow and ice from the driveways and was required to provide a supervisor or foreman to check the work. The work would also be checked by a manager and sometimes Cavaliere would double check the work at the end of the day. He would be at Lexington Green two to three times a month. The contract said that after plowing

snow, Best Lawns would inspect to ensure that the areas were clear. The condo association had no obligation to supervise his employees. If Best Lawns knocked down icicles, it was also responsible for removing them from the driveways. However, Best Lawns' contract with Lexington Green did not include routine icicle removal—there had to be a specific work order or instructions for that. The request would usually come from the management company in the form of a written work order. The specific work order would be performed, but Best Lawns would not go up on the roofs to remove ice from there or try to alleviate ice dams inside the gutters. However, part of Best Lawns' routine tasks were to inspect the ground for ice that formed from gutter water, apply salt or "ice melt," and then "chip up any ice build-up." They would use snow shovels and hand tools to knock down icicles, immediately shovel pieces from the driveway, and follow up with an application of salt or "ice melt." On the day of Tudela's accident, crews worked from 9:00 a.m. to 3:00 p.m. and received a work order at 10:32 a.m. to inspect the property and take down the icicles. They were obligated to remove the broken icicles from the driveway. Photographs taken of Tudela's driveway the day after her accident, at 9:45 a.m., showed that there was some ice on the driveway. When looking at the photos, Cavaliere described the ice on the driveway as "build-up" and denied the presence of "any remnants of icicles." He did not know if the ice on the pavement was from icicles falling or dripping or if moisture had come off a car. There had been about a 4" snowfall the day before the accident. It was not unusual for icicles to form on buildings in the Chicagoland area.

¶ 14    The record includes black-and-white photocopies or digital scans of two pictures that Tudela's husband took the evening before she was injured, with the intention of reporting the problem to their landlord or Lexington Green. His photos show slender icicles that hang from the

roof or gutter of the first garage door, some of which hang about half the length of the door. The record also includes a photograph that Cavaliere testified about, which was taken by his employee the morning after Tudela's accident. This photo depicts the first garage door and part of its driveway, where there is a parked car. On the ground near the first overhead door, there is of a large rough patch of ice chunks. It is difficult to discern details in the reproduced exhibit, but the patch is at least as big as the tire on the adjacent parked car.

¶ 15    The record also includes Lexington Green's log of service requests it received from residents of the complex.

¶ 16    Relying primarily on Tudela and Cavaliere's depositions, Lexington Green sought summary judgment, arguing in part that Tudela was speculating about the source of the ice chunk, there was no evidence the piece had developed unnaturally, and there was no evidence that Lexington Green had actual or constructive notice that ice chunks remained on the driveway between the time that Best Lawns finished working at the complex at 3:00 p.m. and the Tudelas returned home at about 3:55 p.m. Best Lawns filed its own motion for summary judgment, in which it argued that it owed no duty regarding the formation of hanging icicles, and that Tudela was speculating that the icicle chunk was associated with Best Lawns' work.

¶ 17    Although there is no transcript of the summary judgment hearing, the circuit court's subsequent written order includes its *sua sponte* determination that the Snow and Ice Removal Act (745 ILCS 75/.01 *et seq*. (West 2016)) required Tudela to plead willful and wanton conduct and that she had not met that burden. The court found there was "no evidence that Lexington Green or Best Lawn[s] did anything or failed to do anything which could be considered willful and wanton;" and because Lexington Green was entitled to summary judgment, its contribution claim was moot

and Best Lawns was also entitled to summary judgment.

¶ 18    Tudela filed a motion for reconsideration in which she argued that the Act was not relevant, the gutters were defective and the ice accumulation was unnatural, and that she had a pending motion for leave to amend. Lexington Green responded that she never created an issue of material fact. The resulting order indicates that the court heard arguments, but it does not specify why the motion was denied and we do not have benefit of a transcript. According to Lexington Green, the court stated that although the statute was not pertinent, it was denying reconsideration for the same reason that it had entered summary judgment in the first place—Tudela had not created an issue of material fact. The written order, however, also grants Tudela's motion to replead.

¶ 19    After Lexington Green received Tudela's amended complaint, it filed a section 2-619 motion to dismiss on grounds that she had no new allegations or arguments. 735 ILCS 5/2-619 (West 2020). Lexington Green argued that Tudela was trying to relitigate the entry of summary judgment against her original allegations and the denial of reconsideration, and that she was essentially filing a second motion for reconsideration. We note that the main difference between the two complaints was that Tudela relied on discovery to add allegations regarding heat tape. Tudela alleged that Lexington Green placed heat tape in gutters throughout the complex to address icing, but did not maintain the heat tape and had received numerous reports about ice and long icicles around the time that she slipped and fell. There is no transcript, but after "hearing and oral argument," the circuit court granted dismissal "for the reasons stated by the Court."

¶ 20    Tudela first argues that the Act is inapplicable and that the court's reliance on it is grounds for reversing summary judgment. She contends that the statute immunizes property owners from ordinary negligence when removing natural accumulations of snow and ice from sidewalks that

abut their property, which are not the facts of this case. She argues that the very large, broken icicle that caused her to slip and fall was an unnatural accumulation on the driveway and that a driveway is not a sidewalk.

¶ 21    We agree that the Act is inapplicable, as it is well-established that it concerns only injuries sustained on sidewalks and not on driveways. See *Murphy-Hylton v. Lieberman Management Services, Inc.*, 2016 IL 120394, ¶ 24 (quoting 745 ILCS 75/1, 2 (West 2010) (since 1979, the statute has "immunized residential property owners [from] liability in connection with their snow or ice removal efforts in order to encourage them to 'clean the sidewalks abutting their residences of snow and ice' ")); *Gallagher v. Union Square Condominium Homeowner's Ass'n*, 397 Ill. App. 3d 1037, 1044 (2010) (the Act's application is limited to sidewalks because it "refers only to sidewalks and makes no mention of driveways or any other type of surface"). However, we will not reverse on this basis, because when denying Tudela's motion to reconsider summary judgment, the court acknowledged its mistaken reliance on the Act, but said it was adhering to summary judgment for a different reason.

¶ 22    Tudela argues there is a material fact dispute about whether her accident was caused by Lexington Green's unnatural accumulation of icicles on the driveway. Lexington Green counters that there is insufficient evidence of roof defects, gutter defects, or another source of unnatural accumulation. Lexington Green also disputes whether Best Lawns was its agent. We agree with Tudela that material fact questions exist regarding ordinary negligence.

¶ 23    "Summary judgment is to be encouraged in the interest of prompt disposition of lawsuits, but as a drastic measure it should be allowed only when a moving party's right to it is clear and free from doubt." *Pyne v. Witmer,* 129 Ill. 2d 351, 358 (1989); *Mickens v. CPS Chicago Parking,*

*LLC*, 2019 IL App (lst) 180156, ¶ 21 (disposing of litigation at a preliminary stage of the proceeding is drastic and summary judgment should be granted only where the movant's right to judgment is free and clear from doubt). " 'Therefore, where reasonable persons could draw divergent inferences from the undisputed material facts or where there is a dispute as to a material fact, summary judgment should be denied and the issue decided by a trier of fact.' " *Frederick v. Professional Truck Driver Training School, Inc.*, 328 Ill. App. 3d 472, 476 (2002) (quoting *Espinoza v. Elgin, Joliet and Eastern Railway Co.*, 165 Ill. 2d 107, 113 (1995)).

¶ 24    We address summary judgment *de novo*. *Mickens*, 2019 IL App (lst) 180156, ¶ 21. "The purpose of summary judgment is not to try an issue of fact but to determine whether a triable issue of fact exists." (Internal quotation marks omitted.) *Kasper v. McGill Management, Inc.*, 2019 IL App (1st) 181204, ¶ 23. The court is to construe the pleadings, exhibits, affidavits, depositions, and admissions on file strictly against the movant and in favor of the nonmovant. *Frederick*, 328 Ill. App. 3d at 476; *Mickens*, 2019 IL App (1st) 180156, ¶ 21. Thus, the record is to be viewed in the light most favorable to the nonmovant. *Frederick*, 328 Ill. App. 3d at 476.

¶ 25    The moving party bears the initial burden of proof and may meet its burden "either by affirmatively showing that an element of the case must be resolved in [its] favor or by establishing that there is an absence of evidence to support the nonmoving party's case." (Internal quotation marks omitted.) *Kasper*, 2019 IL App (1st) 181204, ¶ 23. If the plaintiff cannot establish any element of the cause of action, then summary judgment for the defendant is proper. *Milevski v. Ingalls Memorial Hospital*, 2018 IL App (1st) 172898, ¶ 28. Although a plaintiff is not expected to prove his or her case at the summary judgment stage, in order to survive a motion for summary judgment, the nonmoving party must present a factual basis that would arguably entitle that party

to a judgment. *Robidoux v. Oliphant*, 201 Ill. 2d 324, 335 (2002).

¶ 26    The question of whether a defendant has breached a duty is a factual one that is left to the trier of fact. *Frederick*, 328 Ill. App. 3d at 476. However, prior to that, the question of whether a duty exists is a question of law that is properly decided through summary judgment, because where there is no duty, it is not possible for the plaintiff to recover as a matter of law. *Id.*; *Kokoyachuk v. Aeroquip Corp.*, 172 Ill. App. 3d 432, 436 (1988) (absent a legal duty, there can be no recovery in negligence as a matter of law).

¶ 27    Negligence is "omi[tting] to do something which a reasonable [person] *** would do" or "doing *** something which a reasonable and prudent [person] would not do." (Emphasis omitted.) *Crane v. Triangle Plaza, Inc.*, 228 Ill. App. 3d 325, 329 (1992) (quoting Black's Law Dictionary 1032 (6th ed. 1990)). Illinois regards a claim of willful and wanton conduct as a hybrid of negligent conduct and intentionally tortious conduct. *Davis v. Village of Maywood*, 2023 IL App (1st) 211373, ¶ 16. Therefore, "[a] successful claim based on a theory of willful and wantonness is a claim in which the plaintiff pleads and proves the basic elements of a negligence claim—including that the defendant owed a duty to the plaintiff, the defendant breached the duty, and the breach was the proximate cause of the plaintiff's injury [citation]—and the plaintiff also alleges and establishes either a conscious disregard for the plaintiff's welfare or a deliberate intention to harm." *Id.*

¶ 28    A property owner has control over the construction and maintenance of the premises (*McLean v. Rockford Country Club*, 352 Ill. App. 3d 229, 234 (2004)) and is under a duty to exercise ordinary care in maintaining its property in a reasonably safe condition. *Kasper*, 2019 IL App (1st) 181204, ¶ 24; *Gerwig v. Bruere*, 181 Ill. App. 3d 609, 615 (1989) (property owner owes

duty of reasonable care to discover defects or dangerous conditions on premises and either correct them or give sufficient warning to those lawfully on the land to enable them to avoid the danger). However, under the common law, a property owner does not owe a duty to remove natural accumulations of snow and ice. *Murphy-Hylton*, 2016 IL 120394, ¶ 19; *McLean*, 352 Ill. App. 3d at 233. To hold "otherwise would create an unreasonable burden of vigilance when considering that snowstorms cannot be foreseen or controlled and recognizes the climatic vagaries of this area with its unpredictable snowfalls and frequent temperature changes." (Internal quotation marks omitted.) *Murphy-Hylton*, 2016 IL 120394, ¶ 19. Therefore, if a landowner makes no attempt to remove snow or ice that has naturally accumulated, or makes some attempt but does not remove all of the snow or ice that has naturally accumulated, a landowner is not liable for injuries caused by those natural accumulations, no matter how dangerous they might be. *Mickens*, 2019 IL App (1st) 180156, ¶ 28; *Hornacek v. 5th Ave. Property Management*, 2011 IL App (1st) 103502, ¶ 26 ("A landowner is not responsible for injuries resulting from a natural accumulation of snow or ice that has been left undisturbed."); *Graf v. St. Luke's Evangelical Lutheran Church*, 253 Ill. App. 3d 588, 591-92 (1993) (removing snow but leaving a natural ice formation underneath it is not negligent).

¶ 29    Unnatural accumulations, however, are a different issue. An unnatural accumulation of ice or snow is one that has " 'accumulated by artificial causes or in an unnatural way or by a defendant's own use of the area concerned and creation of the condition, and where it has been there long enough to charge the responsible party with notice and knowledge of the dangerous condition.' " *Murphy-Hylton*, 2016 IL 120394, ¶ 20 (quoting *Fitz Simmons v. National Tea Co.*, 29 Ill. App. 3d 306, 318, 1961)); *Graham v. City of Chicago*, 346 Ill. 638, 643 (1931) ("it would

be neither unreasonable, impracticable, nor expensive, as a general proposition, to compel the removal of ice from sidewalks which was produced by artificial causes"); *King v. Swanson*, 216 Ill. App. 294, 298 (1919) (where defendant's use of property created dangerous, slippery conditions, he was liable). If the defendant created the dangerous condition through its own negligence, then the plaintiff does not need to show that the defendant had actual or constructive notice of the condition. *Hornacek*, 2011 IL App (1st 103502, ¶ 29. Generally, notice is a question to be addressed by the trier of fact. *Id*.

¶ 30     A landowner is not unduly burdened by the expectation that it will not "add to the difficulties facing Illinois residents from natural accumulations of ice and snow by permitting unnatural accumulations due to defective construction or improper or insufficient maintenance of the premises." (Internal quotation marks omitted.) *McLean*, 352 Ill. App. 3d at 234; *Gilberg v. Toys "R" Us, Inc.*, 126 Ill. App. 3d 554, 557 (1984). Liability based on a defective condition or negligent maintenance that causes an unnatural accumulation is illustrated by *McLean*, in which it was alleged that the owner of Rockford Country Club failed to correct defects in the pitch of the roof and the size and application of the gutters, and that the defective building conditions caused water to overflow the eaves and gutters and form numerous large, heavy icicles. *McLean*, 352 Ill. App. 3d at 238. One rather large icicle came crashing down upon an approaching patron and caused serious injuries to his head, neck and shoulders. *McLean*, 352 Ill. App. 3d 229. The trial court dismissed the action after finding that recovery was precluded by the natural accumulation rule. *Id*. at 230. However, the appellate court reversed, reasoning that the failure to correct defective building conditions that caused an unnatural accumulation of water and ice could be common law negligence. *Id*. at 238-39. Specific building defects had been alleged, including an improperly

pitched overhang, improperly hung and sized gutters and downspouts, and improper drainage from the overhang. *McLean*, 352 Ill. App. 3d 238. Another unnatural accumulation, this one involving insufficient property maintenance, was described in *Lapidus*, in which an apartment building owner failed to fix a leaky roof, which allowed precipitation to repeatedly collect outside the front door and create a depression in the concrete landing. *Lapidus v. Hahn*, 115 Ill App. 3d 795 (1983). Water puddled in that area and then formed a 4-to-5' patch of ice even when there was no ice or snow on the street or sidewalk. *Id.* at 800-01. Since the water and ice did not accumulate on the landing from natural causes, the building owner was liable for injuries that a tenant sustained when she tried to leave her apartment. *Id.* at 801.

¶ 31    A property owner's liability can also be based on voluntarily undertaking the task of removing ice and snow, but doing so negligently. *Murphy-Hylton*, 2016 IL 120394, ¶ 22. Once a party makes an effort to remove naturally occurring snow, they have a duty to exercise ordinary care in accomplishing the task. *Sims v. Block*, 94 Ill. App. 2d 215, 222 (1968). A mound of snow created by shoveling or plowing or an ensuing runoff that refreezes into a sheet of ice is not the result of naturally falling snow. *Russell v. Village of Lake Villa*, 335 Ill. App. 3d 900, 994 (2002); *Mickens*, 2019 IL App (1st) 180156, ¶ 30. In *Sims*, for instance, an apartment tenant broke his leg in the parking lot when he got out of his car and slipped on a 5 or 6" ridge of ice and snow that the owners had knowingly left behind when they plowed the lot. *Id*.

¶ 32    Furthermore, a snow removal contractor may be liable to a third party, such as a commercial building tenant or a condo resident, where the contractor negligently removes snow and ice and creates or aggravates an unnatural accumulation of snow and ice. *McCarthy v. Hidden Lake Condominium Ass'n*, 186 Ill. App. 3d 752 (1989). This type of contract is formed for the

protection of third parties coming onto the landowner's property, and the hired contractor must perform the service with reasonable care. *Mickens*, 2019 IL (1st) 180156, ¶¶ 60-61. An illustrative case is *Hornacek*, in which a snow removal contractor purportedly piled snow in such a way that it melted and refroze over a parking lot. *Hornacek*, 2011 IL App (1st) 103502. The landowner had a duty to provide a safe means of travel for pedestrians between the parking lot and the office building, and the snow removal contractor had a duty to exercise reasonable care in removing the snow and ice. *Hornacek*, 2011 IL App (1st) 103502, ¶ 31. We also refer to *McCarthy*, in which it was alleged that a condo complex's snow removal contractor cleared only the middle portion of a driveway, rather than the entire surface, which created unnatural banks of snow and ice that encroached up to a foot onto the driveway and then melted and refroze into slippery walls. *Id*. at 753-54. A condo resident backed her car out of her garage, then had to walk on one of the snowbanks in order to close the garage door and return to her vehicle. *Id*. The defective snow and ice removal—the contractor's creation of an unnatural accumulation—led to her slip-and-fall and was actionable. *Id*. at 758.

¶ 33    Here, in order to survive Lexington Green's motion for summary judgment, Tudela did not have to prove her case, but she needed to "provide sufficient evidence to allow the trier of fact to find defendants [Lexington Green or its agent, Best Lawns] accountable for the unnatural accumulation of water, ice or snow that caused [her] injury." *Hornacek*, 2011 IL App (1st) 103502, ¶ 30; *Mickens*, 2019 IL App (1st) 180156, ¶ 36 ("it is [the plaintiff's] burden to demonstrate an identifiable link between the snow pile and ice on which she slipped"). She needed to show that Lexington Green or its agent created the unnatural accumulation or had actual or constructive knowledge of the condition. *Id*. The record indicates that Tudela met her burden.

¶ 34   As the property owner, Lexington Green owed a duty of reasonable care when removing snow and ice from the driveway so that it did not create an *unnatural* accumulation. *Hornacek*, 2011 IL App (1st) 103502, ¶ 26 ("If the landowner or a hired contractor creates an unnatural accumulation, then liability may attach as a result of failing to use ordinary care."); *Murphy-Hylton*, 2016 IL 120394, ¶ 20 (landowners owe "a duty of reasonable care to prevent unnatural accumulations of ice and snow on their premises where they have actual or constructive knowledge of the dangerous condition").

¶ 35   The undisputed facts are that long icicles hung over the garages when Tudela left home in the morning, Lexington Green gave Best Lawns a work order to remove the icicles, and Best Lawns plowed snow from the driveway and then worked on the hanging ice. It is also undisputed when Tudela returned in the afternoon, she parked on the driveway, and while walking towards her building's entrance, she slipped and fell in front of the first garage door.

¶ 36   The fact dispute is about whether she slipped on a chunk of icicle that Best Lawns knocked down and negligently left on the driveway, as she contends, or whether Best Lawns cleared away all of the ice, as it contends. Tudela is claiming she was injured due to Best Lawns' creation of an unnatural accumulation when it knocked down the icicles. The alleged circumstances are comparable to those in *Hornacek*, 2011 IL App (1st) 103502, in which a contractor diverted snow, but failed to properly relocate it, and a pedestrian slipped and fell on the resulting unnatural accumulation of ice. Similarly here, there is sufficient evidence from which a trier of fact could find that the ice Tudela slipped on was an unnatural accumulation created by Best Lawns as it performed Lexington Green's ice removal work order. She identified an unnatural source of ice on the driveway, she alleged and testified that she slipped on that ice, and the presence of ice on

the driveway was confirmed when Best Lawns photographed the area the next morning. There is a plausible link between Best Lawns' work in front of the garages and the ice that allegedly caused Tudela's fall. A reasonable inference that can be drawn from this record is that, through its own negligence, Best Lawns created the broken icicle or ice patch issue on Tudela's driveway. A trier of fact could reasonably find Lexington Green and/or its agent are responsible for negligence.

¶ 37 There is also a fact dispute as to whether Lexington Green had notice of the ice on the driveway. Tudela "does not need to show that [Lexington Green or Best Lawns] had either actual or constructive notice where she alleges [one or both of them] created the condition." *Hornacek*, 2011 IL App (1st) 103502, ¶ 34 (citing *Reed v. Wal-Mart Stores, Inc.*, 298 Ill. App. 3d 712, 715 (1998) (patron who stepped on rusty nail protruding from board in store's outdoor garden area did not need to prove actual or constructive notice when she could show the defendant's negligence created the dangerous condition)). Tudela alleged that Lexington Green's landscape maintenance contractor created the dangerous condition on her driveway.

¶ 38 But even if this is an instance when the plaintiff has to show notice, Tudela provided ample evidence to support a finding that Lexington Green had both actual and constructive notice of the condition of the driveway.

¶ 39 "In order to establish constructive notice, time 'is a material factor,' and it is incumbent upon plaintiff to establish that the defect was present for a sufficiently long time to constitute constructive notice to the [defendant]." *Milevski*, 2018 IL App (1st) 172898, ¶ 30; *Smolek v K.W. Landscaping*, 266 Ill. App. 3d 226, 2011 IL App (1st) 103502, ¶ 29; *Ishoo v. General Growth Properties, Inc.*, 2012 Il App (1st) 110919, ¶ 28. Generally, notice is a question of fact for a jury to decide. *Coultas v. City of Winchester*, 208 Ill. App. 3d 238, 240-41 (1991). Constructive notice

may be shown either with evidence that (1) "the dangerous condition was part of a pattern of conduct or a recurring incident," or (2) the dangerous condition existed for a sufficient length of time that the condition should have been discovered through the exercise of ordinary care. *Ruda v. Jewel Food Stores, Inc.*, 2014 IL App (1st) 230582, ¶ 41. See also *Nicholson v. St. Anne Lanes, Inc.*, 136 Ill. App. 3d 664, 668-69 (1985).

¶ 40    Tudela argues that constructive notice is shown through a broad pattern of conduct or recurring issues with icicles. Lexington Green hired Best Lawns to perform routine snow removal under certain conditions. However, the snow removal services did not include ice inspection or removal, and ice and icicles were not routinely addressed at the complex. Icicles would only be remediated if Lexington Green issued a work order and paid Best Lawns for the extra work. Cavaliere testified that icicles were a recurring problem at the condo complex, which he attributed to water dripping from the gutters and forming ice on the driveways. Remmert acknowledged that, historically, the board received complaints about icicles hanging over the garages and that she herself saw icicles that were more than 3' long but did nothing about them. Lexington Green did not assign anyone to proactively look for icicles, did not have a committee that was specific to snow and ice, and would not act until residents complained that they were experiencing problems.

¶ 41    In addition, around the time of Tudela's accident on February 12, 2018, numerous residents complained that weather conditions were causing dangerous ice and icicles to accumulate at their units. Four days prior, on February 8th, a resident of 366 Pinetree Lane, #B2, e-mailed Lexington Green to say:

"[T]there is a huge chunk of ice on the walkway to the front door of the building. It is invisible to the naked eye and unfortunately my husband fell down and hurt himself. I

would need you to fix that ASAP before it becomes fatal. *** Unfortunately, it's the only way to get in and out of the home[.] There is another chunk of ice—in front of the garage as well which would need to be taken care [of] ASAP."

¶ 42     Also on February 8th, a resident of 235 Driftwood Lane, #B1 reported, "Icicles are forming directly over b1 and b2 in front and back near the middle of the building." Lexington Green documented that the resident was "concerned that there may be an issue with the roof or something."

¶ 43     We will summarize only some of the many reports about ice and icicle formations on the day that Tudela fell, February 12th. Lexington Green documented, "Owner [of 268 Mayfair Lane, #B2] reporting ice dam[] on the garage roof. She states the entire driveway has ice[.]" In an e-mail that appears to have been sent hours before Tudela's accident in the afternoon, a resident of 366 Pinetree Lane, #B2 stated, "Good Morning, we were trying to take our other car from the garage but unfortunately cannot enter. The photo shows a lot of ice on the ground and on the top of the garage. It is very slippery and [the] car cannot get outside." The owner of 371 Heather Court, #C2, similarly reported "ice build up in the gutters [is] causing the ground to be very slippery" and "there was a heating cable put in a while ago[,] however it is not melting the ice."

¶ 44     There were additional complaints over the next two days, including the report from Tudela's husband on February 13th that she had slipped on the 12th; and a follow-up e-mail from the owner of 314 Wildberry Court, #B2, who reported that, in addition to the ice around and over her garage on the 12th, the ice on the driveway extended to the interior of her garage.

¶ 45     The record also includes the photo of very long hanging icicles that Tudela's husband took the day before her slip-and-fall and the photo that Best Lawns' employee took the day after the

accident, which even Cavaliere acknowledged showed ice on Tudela's driveway. As we summarized above, the patch of rough ice on the driveway appears to us to be at least as big as a car's tire.

¶ 46    The record also indicates that despite significant icicles and icing issues within the complex in early February 2018, Remmert never heard about the complaints and she was unaware of anything that Lexington Green did that month to remediate icicles. The documentary evidence that Tudela compiled included Lexington Green's notations about how it responded to the complaints. For instance, with respect to some of the ice complaints on February 12th, Lexington Green noted, "Vendor please inspect and address, and please check the entire property for these issues and take down these icicles." Whenever Lexington Green did issue a work order to address icicles, according to Remmert, Lexington Green did not inspect the work that was performed on its behalf. The board considered it to be Best Lawns' responsibility to ensure that it was adequately performing the tasks that it was hired to perform. Best Lawns' personnel described using hand tools to knock down or chip away at hanging icicles and said that the crew was not expected to remove ice from any roofs or work around parked cars. Once the icicles were knocked down, someone had to sweep or shovel the pieces from the driveways and walkways. Someone from Best Lawns was supposed to inspect the work that was completed on February 12th, but no one testified as to whether that occurred before Tudela was injured. Additionally, Lexington Green had previously installed heat tape to remediate icicles, but it did not try to maintain the tape. Essentially, it only had the property's handyman switch on the electrified cables at the beginning of the cold season and then switch them off months later. No one inspected the tape to confirm that it was working and none of the tape had ever been replaced. Although the association relied

on residents to report problems with the heat tape, Remmert admitted that residents were never notified about the heat tape and some might not even realize that the heat tape was there.

¶ 47    Thus, taking a broad approach, Tudela emphasizes the historic icing problems, the apparent need for heat tape that was functioning, and then the ice and icicle complaints that were lodged from various parts of the condo complex in February 2018.

¶ 48    Lexington Green takes a narrower focus. It argues that it had neither actual nor constructive notice about the specific icicle chunk that Tudela allegedly stepped upon, because Best Lawns completed its icicle remediation work at 3:00 p.m. and Tudela slipped on the chunk at approximately 3:55 p.m. Lexington Green argues that less than an hour is not enough time to impute notice. It argues that there was no evidence that the roof or gutters were defective, ice naturally forms in this geographic area during the winter months, and there were no complaints about Tudela's specific building.

¶ 49    This is a disagreement over conflicting evidence about constructive notice that should be resolved in the first instance in the circuit court rather than in a court of review. See *Coultas*, 208 Ill. App. 3d at 240-41 (generally, notice is a fact question). There is a fact dispute about notice.

¶ 50    We decline to address Lexington Green's contention that Best Lawns was an independent contractor rather than an agent. In its summary judgment order, the circuit court made one brief remark about agency, stating in a single sentence, that Tudela "did not mention Best Lawn[s] nor plead[] *respondent superior.*" The court was referring to a legal doctrine that holds an employer liable for the tortious actions of an employee if the actions occur within the scope of employment. See *Webb by Harris v. Jewel Companies, Inc.*, 137 Ill. App. 3d 1004, 1006 (1985). The court did not cite or discuss agency law in its memorandum order. The employer-employee doctrine is not

in any of the parties' written submissions regarding summary judgment. We do not know what the parties said during the hearing, because we do not have a transcript. It appears that the court *sua sponte* introduced the concept of *respondeat superior*. The question of whether one is an independent contractor is generally a question of fact. *Conrads v. Rush-Copley Medical Center, Inc.*, 2023 IL App (2d) 220455, ¶ 39. The argument should be developed and ruled on in the circuit court before it is addressed in an appellate court. This argument has no bearing on the present question of whether the circuit court properly granted summary judgment between Tudela and Lexington Green. The circuit court stated that its summary judgment ruling against Tudela's action mooted Lexington Green's third-party complaint against Best Lawns and entitled Best Lawns to summary judgment.

¶ 51    Because a fact dispute exists as to whether there was an unnatural accumulation of ice or that the property owner had actual or constructive notice of the condition, summary judgment was granted in error.

¶ 52    Furthermore, in addition to its common law duty regarding *unnatural* accumulations, the record indicates that Lexington Green voluntarily assumed the duty of removing *natural* snow and ice accumulation from Tudela's driveway and walkway based on a contractual promise to maintain the common elements of the condominium complex. It was established early in the litigation, by landlord Ku's successful motion for summary judgment, that unit owners such as herself were not required to maintain, repair or replace the community's common elements (*e.g.*, the roofs, gutters, driveways and walks) and that Lexington Green voluntarily assumed the powers and duties to perform these tasks. These facts were shown through the attachments to Ku's motion: the condominium declaration and by-laws, Lexington Green's discovery responses, and Lexington

Green's contract with a property manager for the 2016-2019 timeframe. There was also Remmert's testimony that unit owners and tenants were not responsible for snow and ice removal—that was Lexington Green's obligation. When a landowner "makes a direct promise to an individual to keep the property free of snow or ice accumulation," but "fails to do so, and the individual is injured by the presence of snow or ice, the landowner is liable to the individual even if the snow or ice was the result of a mere natural accumulation." *Mickens*, 2019 IL App (1st) 180156, ¶ 56.

¶ 53    Lexington Green's voluntary undertaking to remove natural accumulations of snow and ice is an additional reason that a trier of fact could find Lexington Green liable for negligence.

¶ 54    Furthermore, Best Lawns had a voluntary undertaking regarding snow and ice removal. It contracted with Lexington Green to routinely remove snow and it also accepted a work order on the day that Tudela was injured to remove the hanging ice. Although Tudela did not have a contractual relationship with Best Lawns, contracts between a landowner and a snow removal contractor may impose a duty of care on the contractor to third parties coming onto the land. *Mickens*, 2019 IL App (1st) 18065, ¶¶ 59-61. Arguably, Best Lawns "would be liable even for a *natural* accumulation of snow or ice, because [it] contractually promised to remove it." (Emphasis in original.) *Id*. at ¶ 74. In other words, the natural accumulation rule that is applicable to landowners in some instances would never apply to Best Lawns because it made a promise to Lexington Green. A "contractor's failure to remove naturally accumulating snow or ice after promising to do so, leading to a third person's injury, could result in that contractor's liability to that third person." *Id*. at ¶ 76. "[W]hile the failure of a landowner to remove natural accumulations of snow or ice is mere passivity or inaction, a *contractor's* failure to do so after inducing reliance from the landowner based on that promise, is more than mere inaction but is, in fact, no different

than 'creat[ing] the risk' itself." (Emphasis in original.) *Id*. at ¶ 86. When Best Lawns knocked down icicles over Tudela's driveway, Best Lawns was required to exercise reasonable care for the protection of third parties, such as Tudela (*Id*. at ¶¶ 96-98), and to clear the ice debris that it had created. Whether Best Lawns was negligent in performing its services is a material question of fact.

¶ 55    Viewing the record in the light most favorable to the nonmoving party, there are questions of fact as to whether Tudela slipped and fell as she claimed on an unnatural accumulation of ice that had been negligently left on her driveway by Lexington Green and/or its hired contractor, Best Lawns. The record indicates there was a significant issue of icicles and melting and refreezing snow and ice within the condo complex and that residents complained to Lexington Green about these problems before Tudela was injured. From these facts, a reasonable inference can be drawn that Lexington Green negligently maintained the premises. Another reasonable inference is that Best Lawns knocked down icicles over Tudela's driveway, failed to clean up the unnatural accumulation it had created, and caused Tudela's injury. Finally, there is also a question of material fact as to whether Lexington Green and Best Lawns voluntarily promised to remove natural accumulations of snow and ice, but failed to use reasonable care in performing their undertakings.

¶ 56    Based on the record, summary judgment in favor of Lexington Green and Best Lawns should have been denied and Tudela's motion for reconsideration should have been granted. Tudela pointed out the court's reliance on an inapplicable statute about snow and ice removal from residential sidewalks and she also identified material questions of fact as to whether Lexington Green or its agent, Best Lawns, was negligent. See *North River Insurance Co. v. Grinnell Mutual Reinsurance Co.*, 369 Ill. App. 3d 563, 572 (2006) (the intended purpose of a motion to reconsider

is to bring to the court's attention newly discovered evidence, changes in the law, or errors in the court's previous application of existing law).

¶ 57  Tudela's final argument is that it was error to dismiss her amended complaint. She argues that by filing a section 2-619 motion (735 ILCS 5/2-619(a)(9) (West 2020)), Lexington Green was admitting to the legal sufficiency of her pleading, but it then improperly used the motion to dispute the facts that she was relying upon. Section 2-619(a)(9) provides for dismissal when "the claim asserted against defendant is barred by other affirmative matter avoiding the legal effect of or defeating the claim." *Id*. She cites *Inland Real Estate* for the proposition that where an "affirmative matter" is merely evidence upon which defendant expects to contest an ultimate fact stated in the complaint, section 2-619 should not be used. *Inland Real Estate Corp. v. Lyons Savings & Loan*, 153 Ill. App. 3d 848, 854 (1987).

¶ 58  Pursuant to section 2-619(a)(9), a complaint may be dismissed on the basis of issues of law or easily proven issues of fact. *Johnson-Jordan v. CITGO Petroleum Corp.*, 2022 IL App (2d) 210209, ¶ 12. The movant is admitting to all well-pled facts in the complaint, as well as reasonable inferences that can be drawn from those facts, but is asking the court to conclude there is no set of facts that would entitle the plaintiff to recover. *Reed v. White*, 397 Ill. App. 3d 975, 978 (2010). "An appeal from a section 2-619 dismissal requires the same analysis as an appeal following a grant of summary judgment; in both instances, 'the reviewing court must ascertain whether the existence of a genuine issue of material fact should have precluded the dismissal, or absent such an issue of fact, whether dismissal is proper as a matter of law.' " *Johnson-Jordan*, 2022 IL App (2d) 210209, ¶ 13. In order to survive the motion, Tudela needed to establish at least a genuine issue of material fact as to whether Lexington Green's conduct with respect to her safety was

willful and wanton. *Jackson v. Kane County*, 2021 IL App (2d) 210153, ¶ 13. The ruling is addressed *de novo. Id.*, *Johnson-Jordan*, 2022 IL App (2d) 210209, ¶ 13.

¶ 59    The dismissal order does not specify the court's reasons and there is no transcript or one of its alternatives. See 155 Ill. 2d R. 323 (eff. July 1, 2017), R. 321 (eff. Oct. 1, 2021). When the circuit court has not heard evidence and has based its decision solely on pleadings and other documents, we may review the issues of law without a report of proceedings. *Alpha School Bus Co., Inc. v. Wagner*, 391 Ill. App. 3d 722, 734 (2009). The record and appellate briefs suggest that the court was persuaded by Lexington Green's argument that the amended complaint was essentially a second motion for reconsideration.

¶ 60    An amendment may be appropriate where summary judgment is entered on the theory pled, but depositions and affidavits indicate that the plaintiff can replead the claim under a different theory. *Steinberg v. Dunseth*, 276 Ill. App. 3d 1038, 1047 (1995). In deciding whether postsummary judgment amendment is proper, the court considers four factors: "(1) whether the proposed amendment would cure the defective pleading; (2) whether other parties would sustain prejudice or surprise by virtue of the proposed amendment; (3) whether the proposed amendment is timely; and (4) whether previous opportunities to amend the pleading could be identified." *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273 (1992). The plaintiff must satisfy all four factors. *United Conveyor Corp. v. Allstate Insurance Co.*, 2017 IL App (1st) 162314, ¶ 36.

¶ 61    As we indicated above with respect to summary judgment, Tudela's original complaint created an issue of material fact as to whether Lexington Green was negligent. She amended with facts that she believed described a higher form of negligence, willful and wanton conduct.

¶ 62    Willful and wanton conduct must be well pled rather than merely labeled as such. *Majewski v. Chicago Park District*, 177 Ill. App. 3d 337, 341 (1988). Willful and wanton conduct goes far beyond mere inadvertence, which may constitute ordinary negligence. *Id*. at 340. It has been defined as " 'a course of action which shows actual or deliberate intent to harm or which, if the course of action is not intentional, shows an utter indifference to or conscious disregard for a person's own safety or the safety or property of others.' " *Pikovsky v. 8440-8460 N. Skokie Blvd. Condominium Ass'n, Inc.*, 2011 IL App (1st) 103742, ¶ 15 (quoting *Kurczak v. Cornwell*, 359 Ill. App. 3d 1051, 1060 (2005)). A defendant's " 'utter indifference' or 'conscious disregard' for the safety of others may be inferred from the outrageous nature of the conduct." *Kurczak*, 359 Ill. App. 3d at 1060. Willful and wanton conduct is conduct that shocks the conscience. *Oravek v. Community School District 146*, 264 Ill. App. 3d 895, 900 (1994). "While the question of willful and wanton conduct is a question of fact for the jury to resolve, the court must first determine if the plaintiff has presented enough factual evidence to present the issue to the jury." *Kurczak*, 359 Ill. App. 3d at 1060. If the plaintiff has not produced evidence of such conduct, then the court should find as a matter of law that the defendant's conduct was not willful and wanton. *Id.*

¶ 63    Tudela's amended allegations and evidence concerned ice and icicle complaints residents made between February 8 and 14, 2018; Lexington Green's historic response to icicle issues and its response to the complaints in February; and then the adequacy of Best Lawns' work. She did not, however, allege or present any evidence of willful and wanton conduct. She contends Lexington Green "did nothing to fix the problems" or "made a choice to ignore the [icicle] problem," but her characterizations are not specific to her driveway and claimed injury. Even if the icicle chunk on her driveway was an unnatural accumulation, Lexington Green did not

disregard conditions within the condo complex or at her specific address. There is evidence of icicle issues within the complex, but Tudela affirmatively testified that there were no historic problems with her driveway. Her husband took a photo of icicles the day before, but he did not report his concern until after she fell, and no one else using her building's driveway complained either. Lexington Green retained a snow and ice removal contractor for the complex and Best Lawns' work was performed to Tudela's apparent satisfaction until the day she slipped and fell. The evidence also indicates that Lexington Green did not disregard the complaints in February— it issued a work order or orders for icicle removal and Best Lawns went to work. Lexington Green or Best Lawns' actions with respect to Tudela's driveway do not amount to utter indifference to or reckless disregard for her safety. There is a question of whether Lexington Green or Best Lawns committed ordinary negligence, but what occurred is not outrageous or shocking to the conscience. The facts are insufficient as a matter of law to amount to willful and wanton conduct. Moreover, Tudela's request for punitive damages was unwarranted because that type of award is "only for conduct involving an element of outrage similar to that normally found in crime." *Johnston v. Anchor Organization for Health Maintenance*, 250 Ill. App. 3d 393, 397-98 (1993). "The conduct must be outrageous, *i.e.,* defendant's acts are done with an 'evil motive' or with 'reckless indifference to the rights of others.' " *Id*. (quoting Restatement (Second) of Torts § 908, comment b, at 464-65 (1979)). None of the circumstances here support punitive damages. For these reasons, the portion of the circuit court order that dismissed the new willful and wanton allegations and request for punitive damages was correct.

¶ 64    Based on the above, we reverse the dismissal of the portion of Tudela's amended complaint which stated negligence as to Lexington Green and affirm dismissal of the willful and wanton and

punitive damages allegations as to Lexington Green. Further, because Lexington Green was never entitled to summary judgment based on this record, its third-party complaint for contribution from Best Lawns did not become moot. Therefore, we reverse the summary judgment ruling in favor of Best Lawns and we reinstate Lexington Green's pleading.

¶ 65     Affirmed in part and reversed in part.